14-1443

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

CATHETER CONNECTIONS, a Delaware corporation,

Plaintiff-Appellee

v.

IVERA MEDICAL, a California corporation

Defendant-Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH IN 2:14-CV-00070
JUDGE TENA CAMPBELL

---

**CORRECTED BRIEF OF APPELLANT
NON-CONFIDENTIAL**

Jonathan Hangartner
X-Patents, APC
5670 La Jolla Blvd.
La Jolla, California  92037
Telephone:  (858) 454-4313
jon@x-patents.com

Nathan D. Thomas
Jones Waldo Holbrook & McDonough, P.C.
170 S. Main St., Suite 1500
Salt Lake City, UT 84101
Telephone:  (801) 521-3200
nthomas@joneswaldo.com

*Counsel for Appellant Ivera
Medical Corporation*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendants-Appellants certifies the following:

1. **The full name of every party or amicus represented by me is**:

   Ivera Medical Corporation

2. **The name of the real party in interest represented by me is:**

   Ivera Medical Corporation

3. **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

   None

4. **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

   Jonathan Hangartner
   X-Patents, APC
   5670 La Jolla Blvd.
   La Jolla, California  92037
   Telephone:  (858) 454-4313
   jon@x-patents.com

   Nathan D. Thomas
   Elizabeth M. Butler
   Brady L. Rasmussen
   JONES WALDO HOLBROOK &
   McDONOUGH PC
   170 South Main Street, Suite 1500
   Salt Lake City, Utah  84101
   Telephone:  (801) 521-3200
   nthomas@joneswaldo.com
   ebutler@joneswaldo.com
   brasmussen@joneswaldo.com

June 30, 2014                    /s/ Jon Hangartner

2

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ......................................................... 10

JURISDICTIONAL STATEMENT ............................................................. 10

STATEMENT OF THE ISSUES ................................................................ 11

STATEMENT OF THE CASE ................................................................... 12

STATEMENT OF THE FACTS ................................................................ 15

    A. <u>Ivera's Products and History</u> ........................................... 15

    B. <u>Catheter Connections' Prior Patent Infringement Actions</u> ........ 16

    C. <u>The Current Patent Infringement Action</u> ...................................... 18

    D. <u>The Asserted Patents, Accused Curos Tips Products, and Prior Art Caps</u> ................................................................. 20

    E. <u>The Market for Disinfecting Caps</u> ...................................... 26

    F. <u>The Preliminary Injunction</u> ............................................... 30

SUMMARY OF THE ARGUMENT ........................................................... 35

STANDARD OF REVIEW ....................................................................... 37

ARGUMENT ........................................................................................ 37

3

I.    THE DISTRICT COURT ERRED IN FINDING THAT CATHETER CONNECTIONS PROVED A LIKELIHOOD OF SUCCESS ON THE MERITS ............................................................................... 37

   A.    The Court In Its Construction and Application of Disputed Terms ............................................................................... 38

         1.    The Term "Engage Against" Requires More Than Mere Contact or Abutment ............................................. 39

         2.    The Term "Diminish Flow" Does Not Include Elimination of Flow ............................................. 42

         3.    The "Recess" Is Not Formed By Creating Two Elevations With a Lower Area Between Them ................. 43

   B.    The Court Erred In Finding that Catheter Connections Met Its Burden to Show a Likelihood of Success on Infringement of the '308 Patent ....................................................... 46

   C.    The Court Erred In Its Conclusion that Ivera Failed to Present a Substantial Question as to Invalidity ...................... 49

         1.    The District Court Erred in Concluding that Ivera Failed to Raise a Substantial Question that Claims 1 and 18 of the '681 Patent Are Invalid as Obvious ............................ 50

         2.    The District court Erred In Concluding Ivera Failed to Raise a Substantial Question that Claim 1 of the '308 Patent Is Invalid as Obvious ............................................. 53

II.   THE DISTRICT COURT ERRED IN CONCLUDING THAT CATHETER CONNECTIONS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION ............................................................................... 54

   A.    Catheter Connections' Long Delay Undercuts Any Claim of Irreparable Harm ............................................................. 55

1163070.1

B.    **Catheter Connections' Claimed Injuries Are Compensable in Money Damages** ........................................... 59

C.    **The District Court Failed to Address the Causal-Nexus Requirement that Irreparable Harm Be Caused By the Infringement** ........................................... 62

III.    **THE DISTRICT COURT ABUSED ITS DISCRETION IN SETTING THE BOND AMOUNT** ........................................... 67

IV.    **THE DISTRICT COURT ERRED IN FAILING TO MAKE ADEQUATE FINDINGS OF FACT AND CONCLUSIONS OF LAW.** ........................................... 69

**CONCLUSION** ........................................... 73

1163070.1

# TABLE OF AUTHORITIES

## CASES

*Buckingham Corp. v. Karp,*
   762 F.2d 257 (2d Cir. 1985) ................................................................63

*Citibank, N.A. v. Citytrust,*
   756 F.2d 273 (2d Cir. 1985) ...............................................................55

*Coyne-Delany Co., Inc. v. Capital Dev. Bd. of State of Ill.,*
   717 F.2d 385 (7th Cir. 1983) ..............................................................69

*Davis v. United States,*
   192 F.3d 951 (10th Cir. 1999) ............................................................69

*Foy v. Univ. of Texas at Dallas,*
   CIV.A. 3:96-CV-3406P, 1997 WL 279879(N.D. Tex. May 13, 1997)...............63

*GTE Corp. v. Williams,*
   731 F.2d 676 (10th Cir. 1984) ............................................................55

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*
   49 F.3d 1551 (Fed. Cir. 1995) ............................................................55

*Hybritech Inc. v. Abbott Labs.,*
   849 F.2d 1446 (Fed. Cir. 1988) ..........................................................55

*Kos Pharm., Inc. v. Andrx Corp.,*
   369 F.3d 700 (3d Cir. 2004) ...............................................................70

*Local No. 1 (ACA), Broad. Emp. of Int'l Bhd. of Teamsters, Chauffeurs,*
   *Warehousemen & Helpers of Am. v. Int'l Bhd. of Teamsters, Chauffeurs,*
   *Warehousemen & Helpers of Am.,*
   419 F. Supp. 263 (E.D. Pa. 1976) ........................................................63

*Nutrition 21 v. United States,*
   930 F.2d 867 (Fed. Cir. 1991) ............................................................70

*Pretty Punch Shoppettes, Inc. v. Hauk,*
   844 F.2d 782 (Fed. Cir. 1988) ............................................................70

*Sabinsa Corp. v. Creative Compounds, LLC,*
   609 F.3d 175 (3d Cir. 2010) ...............................................................70

*Seto v. Thielen,*
   CIV. 10-00351, 2010 WL 2612603 (D. Haw. June 28, 2010) ...................63

*T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.,*
821 F.2d 646 (Fed. Cir. 1987) ............................................................................55

*United States v. Roth,*
201 F.3d 888 (7th Cir. 2000) ................................................................68

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork,
Linoleum & Plastic Workers of Am.,*
461 U.S. 757, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983)....................................68

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork,
Linoleum & Plastic Workers of Am.,*
461 U.S. 757n. 14, 103 S. Ct. 2177n. 14, 76 L. Ed. 2d 298 (1983) ....................69

**RULES**

Fed. R. Civ. P. 65(c)                                                    15, 67, 69

1163070.1

## <u>CONFIDENTIAL MATERIAL REDACTED</u>

Below are references to information that was designated as confidential

under the protective order or filed under seal and subsequently redacted in

*Catheter Connections, Inc. v. Ivera Medical Corp.*, 2:14-cv-00070-TC (D. Utah).

| Page | Description |
|------|-------------|
| 27 | Information relating to Ivera Medical Corporation's product pricing, which was filed under seal with the district court. |
| 28 | Information relating to Ivera Medical Corporation's (a) production processes; (b) capital investment; (c) production costs; (d) percentage of 2013 revenue stemming from LAV cap sales; and, (e) 2013 revenues from Curos Tips sales, all of which was filed under seal with the district court. |
| 29 | Information relating to Catheter Connections, Inc.'s (a) average unit price for the Dark blue Male Caps in 2014; (b) average price of the Dual Cap Solo in 2014; (c) average price of the DB Strip in 2014; (d) percentage of anticipated sales consisting of LAV caps in 2014; (e) estimated number of male cap and LAV sales in 2014; (f) cost of goods sold for the male cap; (g) estimated future cost of goods sold; (h) production processes; and, (i) total expenditures, all of which was filed under seal with the district court. |
| 29–30 | Information relating to Catheter Connections, Inc.'s financing, all of which was filed under seal with the district court. |
| 34 | Information relating to Ivera Medical Corporation's anticipated damages as a result of the injunction, which was filed under seal with the district court. |
| 34 | Information relating to Catheter Connections, Inc.'s estimation of Ivera Medical Corporation's damages as a result of the injunction, which was filed under seal with the district court. |
| 35 | Information relating to Catheter Connections, Inc.'s financial condition, which was filed under seal with the district court. |
| 60 | Information relating to calculating lost market share by the parties' experts, which was filed under seal with the district court. |
| 61 | Information relating to the calculating price erosion, which was filed under seal with and by the district court. |

| 61 | Information relating to Catheter Connections, Inc.'s ability to calculate lost market share, lost sales and price erosion, which was filed under seal with the district court. |
|---|---|
| 61 | Information relating to the cost of Catheter Connections, Inc.'s DualCap and Dark Blue Male Cap, which was filed under seal with the district court. |
| 61–62 | Information relating to Catheter Connections, Inc.'s male cap pricing, which was filed under seal by the district court. |
| 62 | Information relating to Catheter Connections, Inc.'s expert's price erosion analysis, which was filed under seal with the district court. |
| 64 | Information relating to Catheter Connections, Inc.'s costs of production, which was filed under seal with the district court. |
| 64 | Information relating to Ivera Medical Corporation's 2013 revenue from male caps, which was filed under seal with the district court. |
| 64–65 | Information relating to Catheter Connections, Inc.'s (a) average per unit product price; and (b) average per unit cost of goods, which was filed under seal with the district court. |
| 65 | Information relating to Catheter Connections, Inc.'s finances and group purchasing organization contracts, which was filed under seal with the district court. |
| 66 | Information relating to Catheter Connections, Inc.'s financing, which was filed under seal with the district court. |
| 67 | Information relating to Catheter Connections, Inc.'s assessment of the financial impact of an injunction on Ivera Medical Corporation, which was filed under seal with the district court. |

## STATEMENT OF RELATED CASES

a. No case arising out of the civil action in the district court was previously

   before this Court.

b. There have been no other appeals from this civil action before this or any

   other court.

## JURISDICTIONAL STATEMENT

The United States District Court for the Central District of Utah (Campbell,

D.J.) had jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1338(a) over the action of

Plaintiff-Appellee Catheter Connections, Inc. ("Catheter Connections") against

Defendant-Appellant Ivera Medical Corporation ("Ivera") seeking a judgment of

patent infringement and preliminary and final injunctive relief.  On April 14, 2014,

the district court issued its Order and Memorandum Decision, on April 14, 2014

granting Catheter Connections motion for preliminary injunction and requesting

further briefing on the issue of a bond.  (A1–A33).  The Court subsequently

entered an Order on the bond and a preliminary injunction on April 24, 2014.

(A34–A38).  This Court has appellate jurisdiction pursuant to 28 U.S.C. §§

1292(c)(1) & 1295(a)(1).  Ivera filed a timely notice of appeal on April 29, 2014.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in finding a likelihood of success on claims of infringement of United States Patent 8,641,681 and United States Patent 8,647,308 based upon construction and application of Claim terms "engage against", "diminish flow" and "recess" contrary to the plain meaning of such terms.

2.     Whether the district court erred in finding a likelihood of success on Catheter Connections claims of infringement of United States Patent 8,641,681 and United States Patent 8,647,308 in the absence of evidence demonstrating that the accused product meets each element of the asserted claims.

3.     Whether the district court erred in summarily concluding without analysis that Ivera failed to raise a substantial question as to the validity of United States Patent 8,641,681  and United States Patent 8,647,308 on the basis of obviousness despite the presence of pertinent prior art not considered at the time of prosecution disclosing each element of the asserted claims.

4.     Whether the district court committed clear error in finding that Catheter Connections would likely be irreparably harmed, in the form of loss of sales, loss of market share, and price erosion, if Ivera was allowed to continue its alleged infringement for the duration of litigation despite the fact that money

damages for the claimed injury are easily calculable in a two-competitor market and such injury cannot be avoided by a cessation of the alleged infringement.

5.     Whether the district court committed clear error in determining that a preliminary injunction was warranted to avoid imminent irreparable harm over 20 months after Catheter Connections first initiated suit to enjoin sale of the accused device and prompt action in the earlier-field action could have avoided any claimed injury in its entirety.

6.     Whether the district court abused its discretion in setting a bond amount based upon Catheter Connections' ability to pay, and far below the anticipated injury to Ivera in the event the preliminary injunction is determined to have been improvidently granted.

7.     Whether the district court's order granting a motion for preliminary injunction provided sufficiently detailed findings of fact and conclusions of law to support its maintenance despite only cursory references to facts, unsupported conclusions, and a failure to address issues raised by the parties.

## STATEMENT OF THE CASE

On April 24, 2014, the district court entered a preliminary injunction based on its finding that Ivera's accused Curos Tips product was likely to be found to infringe claims 1 and 18 of U.S. Patent No. 8,641,681 (the "'681 Patent") and

claim 1 of U.S. Patent No. 8,647,308 (the "'308 Patent"). (A34–A36). The

preliminary injunction is based on erroneous findings of likelihood of success with

respect to infringement that are unsupported by the evidence, flawed claim

constructions, and disregards powerful evidence of invalidity based on prior art.

The district court's flawed findings regarding likelihood of success on the merits

infiltrated the district court's findings that irreparable harm, balance of the harms

and the public interest factors all weighed in favor of granting the injunction.

With respect to likelihood of success on the merits, the district court

erroneously adopted Catheter Connections' flawed claim constructions, then

disregarded Catheter Connections' complete failure to produce evidence

demonstrating that the accused device meets each and every element of the

asserted claims and Ivera's evidence of invalidity. (A10–A15; A17–A19). The

lack of evidence establishing the alleged infringement is reflected in the district

court's decision, which fails to find the facts specially and state its conclusions of

law separately as required by Rule 52(a). On these bases alone, the preliminary

injunction should be reversed or vacated for further findings of fact and

conclusions of law.

With respect to irreparable harm, the district court erred in failing to take

into account the more than twenty (20) months of delay between the filing of

Catheter Connections' first patent infringement claim relating to Ivera's accused male cap product and its motion for preliminary injunctive relief.  The district court improperly excused this delay, which Catheter Connections admits was a purely strategic delay based on the weakness of its arguments on the merits in the three (3) patent infringement cases it had previously asserted against Ivera's male cap product.  Catheter Connections' decision not to seek a preliminary injunction in any of those earlier filed proceedings undercuts any claim of urgency and renders hollow its delayed assertion of irreparable harm.  (A26–A28).  Further, the district court entirely failed to address the requisite, and lacking, causal nexus between Catheter Connections' alleged irreparable harm and the desired injunctive relief.  (A1–A33, *passim*).  Catheter Connections did not identify any injury that, under the circumstances in this case, cannot be redressed by money damages.  The preliminary injunction order failed to properly consider the calculability of Catheter Connections' claimed loss of market share, lost sales and the alleged price erosion in the simple, two-party market at issue. (A22–A26).

Finally, despite acknowledging that Ivera would suffer substantial harm from an injunction and acknowledging that its bond was insufficient to compensate Ivera for the damages it would suffer as a result of the injunction, the Court then failed to make an evidentiary determination regarding the amount of such potential

14

harm and instead set a bond amount based solely on Catheter Connections' alleged ability to obtain a bond.  (A37–A38).  The Court abused its discretion in failing to set a bond amount "proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained" as required by Fed. R. Civ. P. 65(c).

## STATEMENT OF THE FACTS

### A.  Ivera's Products and History

Founded in 2006, Ivera is a start-up company based in San Diego, California, that designs, manufactures, distributes, and sells disinfecting caps for needleless connectors used to access a person's bloodstream on an intravenous set, including both: (i) Luer access valves ("LAVs"), and (ii) male Luer connectors ("male connectors").  Ivera's flagship product, the Curos® Port Protector ("Curos"), is a disinfecting cap for use with LAVs and was the first product launched by Ivera in 2009.  (A1317, ¶ 3).  Ivera launched its accused Curos Tips disinfecting caps for male connectors at issue in this case in early December 2012.

Because the market for disinfecting caps for LAVs was an entirely new market, Ivera was forced to develop the product and the manufacturing process, and also educate prospective purchasers (i.e., hospitals, medical providers, etc.) about the potential benefits and utility of the product.  This was a monumental

15

task, particularly since Ivera was asking hospital purchasers to replace an alcohol swab that cost less than a penny with a cap that cost about a quarter. (A1319, ¶ 10). It was only through making the product available for clinical studies to establish the efficacy of its product and education of its prospective customers that Ivera was able to create a market for its disinfecting caps. (*Id*. at ¶ 11). As a result of these efforts, LAV disinfecting caps have now become an accepted technology in the medical industry. (*Id*. at ¶ 12).

Ivera started developing its disinfecting cap for male Luer connectors ("male connectors") in or about 2011. Male connectors are an alternative access device to administer fluids including medications into an IV set. While the market for disinfecting caps for male connectors is much smaller than the market for LAV caps, Ivera saw sufficient market potential as a complimentary product line to invest in developing a disinfecting cap for male connectors. (A1321, ¶ 18).

### B. Catheter Connections' Prior Patent Infringement Actions

Catheter Connections filed its first action against Ivera accusing it of patent infringement based on its disinfecting cap for male connectors on June 5, 2012, in the United States District Court for the District of Utah, *Catheter Connections, Inv. v. Ivera Medical Corporation*, Case No. 2:12cv000531 (the "531 Case"). (A1321, ¶ 19). Catheter Connections asserted infringement of U.S. Patent 8,172,825 (the

"'825 patent"), which issued on May 8, 2012. (A1321, ¶ 20). Catheter

Connections alleged that beginning in October of 2011 Ivera had "promoted, sold,

prepared or offered to sell" a male connector disinfecting cap that infringed the

'825 patent. (*Id.*).

The 531 case initially alleged infringement against Ivera's prototype Curos

Tips product, but shortly after Curos Tips was commercially launched in early

December 2012, Catheter Connections amended its contentions to assert

infringement by the same accused Curos Tips product at issue in the instant case.

The 531 case is still pending in the District of Utah. Catheter Connections has

alleged irreparable harm in the 531 case, but has never sought a preliminary

injunction. (*Id.*).

On July 31, 2012, Catheter Connections filed its second patent infringement

action against Ivera in the District of Utah, entitled *Catheter Connections, Inc. v.*

*Ivera Medical Corporation*, Case No. 2:12cv748 (the "748 Case"). (A1318, ¶ 21).

The complaint alleged infringement of U.S. Patent Number 8,231,587 (the "'587

Patent"), which had issued that same day. (*Id.*). Catheter Connections alleged

infringement of the '587 patent by the same Ivera male luer disinfecting caps at

issue in the 531 case, and again alleged irreparable harm. Catheter Connections

never sought a preliminary injunction. (*Id.*).

On December 3, 2012, Ivera officially launched its commercial Curos Tips male disinfecting cap product.  On December 8, 2012, Catheter Connections filed its third patent infringement action against Ivera in the District of Utah, entitled *Catheter Connections, Inc. v. Ivera Medical Corporation*, Case No. 2:12cv1127 (the "1127 Case").  (A1319, ¶ 24).  The complaint alleged infringement of U.S. Patent Number 8,328,767 (the '767 Patent"), which issued that same day.  (*Id.*).  In the 1127 case, Catheter Connections alleged infringement by the same commercially available Curos Tips male connector disinfecting cap at issue in the instant action.  Catheter Connections again alleged irreparable harm as a result of the alleged infringement, but did not seek a preliminary injunction. (A1319, ¶¶ 24–25).

### C.  The Current Patent Infringement Action

Catheter Connections elected not to seek a preliminary injunction in any of its three (3) pending patent infringement cases, and Ivera successfully launched the accused Curos Tips product in December 2012.  Sales grew quickly through 2013, and Ivera invested substantial resources to develop the market for male connector disinfecting caps, as well as significant capital in equipment to increase its production capacity.  To this day, Ivera and Catheter Connections are the only companies that offer a disinfecting cap for male connectors.  (A511, ¶ 49).

Nearly fourteen (14) months later, on February 4, 2014, United States Patent 8,641,681 (the "'681 patent") was issued to Catheter Connections. (A39). That same day, Catheter Connections filed the instant action and moved for a preliminary injunction seeking to preclude Ivera from selling its accused Curos Tips male luer disinfecting cap product – the same product accused of infringement in the still-pending 531 Case. (A244–A274). On February 11, 2014, United States Patent 8,647,308 (the "'308 patent") issued to Catheter Connections. (A128). On that same day, Catheter Connections amended its complaint in the instant action to assert a claim of infringement of the '308 patent. (A495-A528).

In this case, unlike its prior three (3) patent infringement cases, Catheter Connections moved for a preliminary injunction based on alleged infringement of Claims 1 and 18 of the '681 Patent and Claims 1 and 7 of the '308 Patent. On April 14, 2014, the district court granted Catheter Connections' motion for preliminary injunction. On April 24, 2014, the district court issued its Order setting bond and preliminarily enjoining sales of the accused Curos Tips product. (A34–A36).

The district court then set the bond amount at $250,000.00 based on its stated belief that Catheter Connections could not "possibly provide a bond in an amount greater than $250,000.00 without destroying their business." (A37). The

1163070.1

district court set this low bond despite acknowledging that Ivera would suffer significant losses in the event it is wrongfully enjoined and that the purpose the bond was to protect Ivera.  (*Id.*).  Yet, the district court erroneously stated that Ivera could seek to recover for any such additional damages beyond the amount of the bond when the injunction was overturned. (*Id.*).

### D.  The Asserted Patents, Accused Curos Tips Products, and Prior Art Caps

The '681 and '308 patents share the same drawings and written description disclosing various embodiments of a disinfecting cap for a male connector. (A1137, ¶ 18).  All of the disclosed embodiments use some form of a biasing member, and most of the disclosed embodiments use that biasing member to actively push a sealing member against the tip of the post of the male connector to seal it off and prevent the disinfecting agent from entering the lumen.  (*Id.*).

The injunction at issue in this appeal was based specifically on Claims 1 and 18 of the '681 Patent and Claim 1 of the '308 Patent.  Claims 1 and 18 of the '681 Patent both include the same element that was the focus of the dispute in the district court proceedings, and which requires:

> [A] member movably disposed within the chamber, the member shaped to enter the lumen so as to engage against an interior edge of an opening of the lumen when the post is received into the receiving portion to diminish flow of the antiseptic agent into the lumen while permitting flow of the antiseptic agent past the member of the post of

the male luer-lock connector.

(A127).

The dispute with respect to claim 1 of the '308 Patent focused on an element

requiring:

> [T]he chamber defining an interior portion extending within the gripping portion of the cap body, wherein the gripping portion extends the cap body longitudinally beyond the skirt of the male-luer lock connector when the post is received into the chamber; and the gripping portion comprising at least one recess having a length and depth, wherein the depth varied monotonically along the length of the recess.

(A216).

The accused Curos Tips® product is a disinfecting cap designed to disinfect

a male Luer connector and protect it against recontamination between uses.  Male

connectors have a post with an open end that provides an entry point into a tubular

structure that connects to an IV line.  The inside of this tubular structure through

which fluids will flow is commonly referred to as the "lumen."  The post itself is

tapered so that it has a conical shape, and typically has a standard 6 percent taper to

conform to a standard for fluid-tight Luer connections.  A skirt extends around the

base of the post.  This skirt has threads around its interior surface to secure the

Luer connection. (A1132, ¶ 5).

The Curos Tips product consists of just four (4) parts: (i) a hard plastic cap,

(ii) a plunger made of the same hard plastic as the cap, (iii) isopropyl alcohol, and

(iii) a laminated foil strip that covers the opening of the cap.  The following photograph provided in Catheter Connections' expert's report shows a longitudinally sectioned Curos Tips cap, with the plunger visible inside the cap. The foil strip and alcohol are no longer present. (A1133, ¶ 6).



The cap itself is a basic male connector cap that is virtually identical in form and function to dozens of prior art protective caps that have been used for many years.  Commonly referred to by clinicians as "dead-enders," such protective caps have typically been provided with the male connectors themselves or sold separately.  Examples of protective caps from the year 2000 product catalog of a medical device supplier called Qosina are shown here:



(A1133, ¶ 7).  Another example of such a prior art protective cap is shown below. This example, shown in white and clear, was from a medical device supplier called the Kipp Group.  This example dates to January 1995. (A1134, ¶ 8).



There are many other examples of such prior art protective caps. (A1134, ¶ 9; A1159-A1193). The following images show a variety of sterile protective caps, many of which were available prior to 2005:





(A1134, ¶ 10).

    These various prior art caps commonly are molded of hard plastic and have a

generally cylindrical body with an opening at one end to receive the post of the male connector. As seen in the images here, most have a gripping feature on the cap body such as ribs or recesses. On the examples shown above, this gripping feature typically is on the portion of the cap body that is distal to (or "away from") the opening and the part of the cap body that receives the post, while on others it extends along the length of the cap body. In either case, the gripping feature extends beyond the skirt of the male connector when the post received into the cap to allow the user's fingers to grasp the gripping feature and use it to tighten or loosen the cap.

In some examples such as the Qosina caps shown above, the entire length of the cap is hollow, while in others like the Kipp Med cap shown above only the portion of the cap body that receives the post (to the right in the photo) is hollow. These prior art caps typically have threads or other protrusions designed to engage the threads in the skirt of male connector. The cap part used in the Tips product has these exact same features common to the prior art cap examples, and does not differ from the prior art protective caps in any way material to the asserted patents. (A1135, ¶ 11).

The plunger part in the accused Curos Tips cap is unique. The plunger is basically capsule shaped, with a thin, relatively rigid, annular flange or "skirt"

1163070.1

encircling it around the midsection.  This flange has a diameter at its outermost

point that is slightly larger than the inner diameter of the hollow cap body, and it

fits into the hollow interior of the cap.  During assembly, the plunger is placed into

the cap after the hollow interior of the cap is partially filled with isopropyl alcohol.

The plunger sits on top of the IPA and the plunger flange presses against the inner

wall of the cap, containing the IPA below the plunger. (A1135, ¶ 12).

The laminated foil strip is then sealed over the opening of the caps to

maintain the plunger and IPA in the cap prior to use.  (A1135–A1136, ¶ 13).   In

use, the Curos Tips product is removed from the foil strip by the clinician and

placed over the post of the male connector.  The post contacts the top surface of the

plunger and pushes it deeper into the cap, forcing IPA around the plunger and past

the flange so that it contacts the outer surfaces of the post of the male connector.

Excess IPA flows on past the post and out of the cap via venting channels cut into

the inner walls of the cap body.  (A1136, ¶ 14).

These venting channels are relatively large to provide a direct, low-pressure

pathway for the IPA to flow beyond the post and out of the cap.  This is an

important design feature of the Tips product.  Unlike all of the examples of

disinfecting caps shown in the asserted patents, there is nothing in the Curos Tips

cap that applies any biasing force to the plunger to press it against the tip of the

post of the male connector.  Thus, there is only light contact between the tip of the male post and the top surface of the plunger.  That contact area, however, prevents fluid from flowing through the opening in the post and into the lumen of the male connector.  Fluids will follow the path of lowest pressure.  By providing a low-pressure pathway out of the cap for the IPA, the venting channels in the Curos Tips cap prevent the buildup of pressure in the cap that would tend to force IPA into the lumen.  (A1136, ¶ 15).

By carefully managing the flow of the IPA during attachment of the cap to the male post, Ivera eliminated the need for any biasing device pushing the plunger against the male post – thus reducing the number of parts and simplifying the manufacturing and assembly process, which significantly reduces production cost. (A1136–A1137, ¶ 16).

The Curos Tips product is designed as a single use product.  When a clinician needs to access the line through a male connector, they remove and discard the Curos Tips cap, access the line, then place a new Curos Tips cap on the male connector.

## E. The Market for Disinfecting Caps

Like Ivera, Catheter Connections also sells disinfecting caps for both LAVs and for male connectors.  As evidenced by the sales information provided to the

26

CONFIDENTIAL INFORMATION REDACTED

district court, however, both companies sell far more LAV caps than male

connector caps.  In fact, the evidence in the district court clearly established that

disinfecting caps for male connectors are a secondary product, accounting for only

a small fraction of sales as compared to LAV caps.

Catheter Connections' has several different product configurations for its

disinfecting caps.  Its first product, called DualCap, is a combination of a dark blue

cap for a male connector and a light blue cap for a LAV.  In 2012, Catheter

Connections launched its DualCap Duo product, which is two light blue LAV caps

nested together, so once again you cannot use just one and save the other.

(A1319–A1320, ¶ 13).  It was not until later in 2012 with the launch of the

DualCap Solo that Catheter Connections began to offer a single cap of any kind.

Notably, this product was a LAV cap, not the dark blue cap for a male connector.

(A1320, ¶ 14).  While it claims that its male disinfecting cap is its "core product,"

Catheter Connections' sales are also predominantly generated through sales of

LAV devices. (A391).

Ivera's production cost for its Curos Tips product has been approximately

$██ per unit using small molds and a manual assembly process.  However, in

2013, after it had a sufficient sales history to evaluate demand and had passed

beyond the time in which Catheter Connections might have moved for preliminary

CONFIDENTIAL INFORMATION REDACTED

injunctive relief in any of its previously pending patent litigations, Ivera invested in automating its production process.  (A1324, ¶¶30–32).  Ivera purchased ███

███████████████████████████████████████████████████████

██████ for its Curos Tips product.  This represented an investment of ████████

██████ in capital.  (A1323, ¶ 31).  Ivera anticipates that automation will reduce its production cost to $████ per unit for Tips. (*Id*. at ¶ 32).

Ivera adjusts the price of its product according to market conditions.  While it initially offered its male caps at a price of roughly $████, Ivera heard from customers that they thought this price was too high.  Those customers indicated that they expected the pricing for male caps to be comparable to female caps, and they were not willing to buy male caps at a significant premium.  Ivera had accordingly aligned its pricing for its Tips cap with its pricing for its Curos LAV cap.  (A1324, ¶ 33).

Regardless of price, Ivera does not expect that sales of its Tips product will ever match those of its LAV caps.  In a hospital and medical care setting the LAV caps are used at a higher rate and are more frequently needed than male caps.  (A1325, ¶ 34).  Ivera's Curos LAV caps accounted for approximately ██% of Ivera's revenue in 2013.  (A1325, ¶ 35).  Ivera's total revenues from sales of Curos Tips in 2013 were $██████.

CONFIDENTIAL INFORMATION REDACTED

Catheter Connections currently sells its "Dark Blue Male Cap" together with a LAV cap as part of its DualCap product in pouches and on its own on IV pole strips.  (A500, ¶¶ 11–12). Catheter Connections' budget projects it will offer its Dark Blue Male Caps for sale in 2014 at an average unit price of approximately $████ per unit. Its other two products employing male cap technology – the Dual Cap Solo and DB Strip sell for average prices of $████ per unit and $████ per unit respectively.  (A1230).  Catheter Connections anticipates that LAV caps will represent approximately ██% of all of Catheter Connections' unit sales for the year 2014 (A1232) and that it would have sold approximately ████████ male caps and ████████ LAV caps in 2014.  (A1231–A1232).

At present, Catheter Connections' cost of goods sold for the male cap is estimated at approximately $████ per unit, although Catheter Connections expects that this figure may be reduced to $████ when it completes ████████████ ████████████████████████.  (A1230).  ████████████████████  ████████████████████ (A1229).

In or about September of 2013, Catheter Connections entered into a ████████ ███████████████████████████████████

CONFIDENTIAL INFORMATION REDACTED



██████████████████████████████████████████ (A1097–

A1098). ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ (A1098).

████████████████████████████████████

████████████████ (A396, ¶ 56).

### F.  The Preliminary Injunction.

On April 14, 2014, the district court issued its Order and Memorandum

Decision granting Catheter Connections' motion for a preliminary injunction and

requested further briefing on the issue of an appropriate bond amount.  (A1–A33).

On April 24, 2014, the district court issued an order setting the bond amount in this

matter at $250,000 and a separate order embodying the preliminary injunction.

(A34–A38).  Catheter Connections posted the bond amount on April 25, 2014, at

which time the preliminary injunction became effective.  The district court's

rulings pertinent to this appeal are summarized below.

### 1.  Construction and Likelihood of Infringement of the '681 Patent

Catheter Connections contended in its motion for preliminary injunction that

Ivera's Curos Tips product infringes Claims 1 and 18 of the '681 Patent.   The

parties agreed that the district court should construe the terms "engage against" and

"diminish flow."  The district court first ignored the plain meaning of the term

"engage" and adopted the proposed construction offered by Catheter Connections

that "engage against" means merely to "contact" or "abut."  (A12).  The district

court then concluded that the term "diminish flow" includes a complete elimination

of flow, despite its plain meaning of reducing the flow to a lesser amount.  (A13).

The district court then found that Ivera's accused Curos Tips product did "engage

against an interior edge of an opening of the lumen" because it came into contact

with the interior edge of the opening.  (A17).

### 2.  <u>Construction and Likelihood of Infringement of the'308 Patent</u>

Catheter Connections contended in its motion for preliminary injunction that

Ivera's Curos Tips product infringes Claims 1 and 7 of the '308 Patent.  The

district court did not construe the terms of or find a likelihood of infringement with

respect to Claim 7.  (A14).

The district court rejected the plain meaning of a "recess" as an "area where

material has been removed to create a hollow."  (A14).  Instead, the district court

found that the term "recess" means "an indentation or cleft" or a point between

"two elevations."  (A14).  These definitions were further qualified by Catheter

31

Connections suggestion that the "recess" is "created by digging material out or removing material or by creating two elevations."  The parties agreed that the term "varie[s] monotonically" should be construed to mean "varying in such a way that it either (i) decreases  or stays the same and never increases, or; (ii) increases or stays the same and never decreases." (A1018).

In finding a likelihood of success on its claim of infringement of Claim 1 of the '308 Patent, the district court focused exclusively on the terms "recess" and whether Ivera's product had a "recess" within the meaning of the claim.  In its analysis, the district court did not even evaluate the "depth" or variation in depth of the "recess" along its length.  (A17–A18).

### 3.  <u>Validity</u>

In conjunction with the preliminary injunction proceedings, Ivera presented substantial evidence that the '681 and '308 Patents were invalid based upon prior art.  Although the district court acknowledged that Ivera identified a number of prior art references, without any analysis the court held that these prior art references did not raise a substantial question of obviousness.  (A18).

### 4.  <u>Irreparable Harm</u>

In finding that Catheter Connections would suffer irreparable harm, the district court ignored Catheter Connections' strategic decision not to seek a

preliminary injunction against Ivera's accused Curos Tips product in any of three prior patent infringement actions filed in 2012 – the first more than 20 months prior to its motion for preliminary injunction in this case. (A26–A28). This despite the fact that Catheter Connections' three prior patent infringement cases provided an opportunity to preserve the status quo and prevent Ivera's entry into the market for disinfecting caps for male connectors entirely. (A26). Instead, Catheter Connections waited nearly two years until Ivera had invested heavily in building the market for such caps and establishing its own production capacity, seeking a preliminary injunction only after it had obtained patents that it deemed better suited to an injunction motion.

Ignoring the clear lack of urgency evidenced by Catheter Connections' delay, the district court found that delay justified because the asserted patents in this case allegedly have broader claim scope and fewer limitations that the patents asserted in the prior cases, and thus were more amenable to an expedited injunction proceeding. (A27). Despite evidence that Ivera was actually creating a new market for disinfecting caps for male connectors, and undisputed evidence that Catheter Connections' revenues from sales of its disinfecting cap for male connectors had increased dramatically during the fourteen (14) months Ivera had been in the market, the district court found that Catheter Connections' percentage

33

CONFIDENTIAL INFORMATION REDACTED

market share had decreased since Curos Tips' introduction. (A23).

Despite the fact that market share will inherently go down when a competitor enters a previously exclusive market, the district court found that this loss of market share demonstrated irreparable harm. The district court also found irreparable harm in alleged lost sales, despite observing that because there are only two competitors in the market at the moment and a sale by Ivera could "automatically be considered a lost sale by Catheter Connections" and thus the subject of a lost profits claim. (A24). With respect to alleged price erosion, the court held that Catheter Connections was forced to lower its price in response to Ivera's Curos Tips cap, despite evidence establishing that Catheter Connections had already dropped its prices before Curos Tips entered the market. (A24–A25).

**5. <u>Bond</u>**

After granting the motion for preliminary injunction, the court ordered the parties to brief the bond issue and Catheter Connections to submit a proposed order. Ivera presented evidence clearly establishing anticipated damages of between $███████████ through the time of trial if it is ultimately determined that the preliminary injunction was improvidently granted. (A2371-2384). Catheter Connections conceded that Ivera could suffer damages in excess of $██████ based solely on lost sales, but advocated for a bond in the amount

CONFIDENTIAL INFORMATION REDACTED

of $███████████████████████████

███████████████. (A2410, ¶ 8). On April 24, 2014, the district court issued

its order granting the preliminary injunction and setting the bond at $250,000.00.

(A34–A36). The district court acknowledged that this amount was insufficient to

compensate Ivera for anticipated injury, but was persuaded that Catheter

Connections could not afford anything more and incorrectly indicated that if the

preliminary injunction was improperly granted, Ivera "will have the opportunity to

recover a judgment from Catheter Connections' ongoing business." (A34).

## SUMMARY OF THE ARGUMENT

The district court's decision granting a preliminary injunction against sales

of the accused Curos Tips product is fatally flawed. The district court's finding of

likelihood of success on the merits is based on erroneous claim constructions. In

particular, the district court improperly construed the critical claim term "engage

against" to mean mere contact or abutment. The plain meaning of this term clearly

requires more than mere contact, and the intrinsic evidence confirms this

understanding. The district court committed further error in failing to require

evidence of infringement, and failing to properly consider substantial evidence of

invalidity based on prior art.

The district court also committed clear error of judgment in finding Catheter Connections delay of nearly two years before seeking a preliminary injunction justified.  Catheter Connections does not dispute that this delay was purely strategic, as it was not confident that its prior patent claims were strong enough to support a preliminary injunction.  This decision by Catheter Connections to defer seeking a preliminary injunction for well over a year after the commercial launch of the accused product undercuts any claim of urgency, and is decisive with respect to the lack of any urgent irreparable harm.

The district court further committed clear error in failing to make findings of fact and conclusions of law in accordance with the requirements of the Federal Rules of Civil Procedure.  This failure compounds the lack of evidence and failure to properly analyze invalidity issues, leaving an inadequate record for this Court of Appeals to properly consider the issues on appeal.

Finally, the district court committed clear error in setting a bond that is admittedly less than necessary to address the damage that will be suffered by Ivera if it is determined that the injunction should not have issued.  The district court's establishment of a bond amount based on its determination regarding Catheter Connections' ability to pay violates the Federal Rules of Civil Procedure and constitutes clear error.

1163070.1

## STANDARD OF REVIEW

"[T]his court reviews a district court's decision granting, denying, or modifying an injunction, in a patent case, for abuse of discretion, applying Federal Circuit law." *International Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1359 (Fed. Cir. 2004); *see also Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F3d. 1331, 1351 (Fed. Cir. 2001). "An abuse of discretion may be established under a Federal Circuit law by showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." *International Rectifier*, 361 F.3d at 1359 (citing *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 6770, 772 (Fed. Cir. 1993)); *see also Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). Claim construction rulings constitute legal rulings by the district court, however, and thus this Court reviews such rulings *de novo*. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303 (Fed. Cir. 2011) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–55 (Fed. Cir. 1998)).

## ARGUMENT

**I.      THE DISTRICT COURT ERRED IN FINDING THAT CATHETER CONNECTIONS PROVED A LIKELIHOOD OF SUCCESS ON THE MERITS.**

A basic predicate to the issuance of a preliminary injunction is a conclusion that the plaintiff is likely to succeed on the merits of its underlying

claims.  To establish a likelihood of success in the context of a patent

infringement matter, the plaintiff must show that:

> [I]n light of the presumptions and burdens that will inhere at trial
> on the merits: (1) the patentee will likely prove that the accused
> infringer infringes on the asserted patent; and (2) the patentee's
> infringement claim will likely withstand the accused infringer's
> challenges to the validity and enforceability of the patent.

*Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012).  The

burden to prove a likelihood of success rests solely on the plaintiff seeking the

injunction. *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319,

1325 (Fed. Cir. 2004).  In the absence of such proof a preliminary injunction is

not warranted and should be reversed. *See, e.g., id.*; *Apple Inc. v. Samsung

Electronics Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013).

## A. <u>The Court Erred In its Construction and Application of Disputed Terms.</u>

Predicate to any finding of infringement, the district court must engage

in claim construction.  *Tate Access Floors, Inc. v. Interface Architectural Res.,

Inc.*, 279 F.3d 1357, 1363 (Fed. Cir. 2002).  The district court must construe

disputed terms used within the asserted claims and apply those constructions in

order to assess whether an accused device infringes the patents-in-suit.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  In construing

claim terms, the court is to apply the ordinary and plain meaning of the term as

understood by a person of skill in the art.  The Court of Appeals reviews construction of claims *de novo*.  *Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303 (Fed. Cir. 2011).

Here, the district court construed two terms found in Claims 1 and 18 of the '681 Patent: "engage against" and "diminish flow."  (A12–A13).  The district court construed only one term used in Claim 1 of the '308 Patent: "recess."  (A14).  These constructions were wrong as a matter of law.

1. The Term "Engage Against" Requires More Than Mere Contact or Abutment.

Claims 1 and 18 of the '381 Patent require:

(c) a member movably disposed within the chamber, the member shaped to enter the lumen so as to <u>engage against</u> an interior edge of an opening of the lumen when the post is received into the receiving portion ....

(A127) (emphasis added).

The district court erred by construing the term "engage against" to mean "contacts or abuts."  (A12).  This construction was essential to the district court's finding of likelihood of success on the issue of infringement, and is contrary to the plain meaning of the term and the intrinsic evidence.  The ordinary and customary meaning of the claim terms is "'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.'"  *Phillips*, 415

F.3d at 1312–13.  A person of ordinary skill in the art at the time of the invention would understand the requirement that the movable member "engage against an interior edge of an opening of the lumen" to require more than mere contact or abutment.

The term "engage" means more than to merely touch and is commonly used to describe parts that interlock or mesh together.  Gears engage when their teeth mesh together.  Threads engage when one mating thread interlocks with its counterpart.  Latches engage when their latching components interlock. (A1142, ¶ 30).

Consistent with this ordinary meaning, the term "engage" is used extensively in the '681 patent to describe the engagement of protrusions on the outside of the cap with the threads on the skirt of the male connector and to describe the interaction between elements of a "connection interface 1042" that provides coupling in a "secure, yet selectively removable fashion."  Examples of such a "connection interface 1042" include threads, "friction-fit, snap fit, or other suitable interfacing arrangements."  These examples all engage by an interlocking or intermeshing of components, not mere contact. (A1142–A1143, ¶ 31).

In its cursory explanation for its construction, the district court states that "engage against" can be construed as "contact" by comparison with Claim 11 that

states "engaging" and "engaging with" and the specification that says: "contact between the tip and the sealing member occurs just prior to engagement of a connection of the connector . . . ." But these examples do not support the district court's construction. In fact, the use of both the terms "contact" and "engagement" in the same sentence shows that the applicant understood that "engage" means something different than mere contact.

This understanding is further supported by the specification, which shows engagement of the member shaped to enter the lumen against the interior edge of the opening of a lumen. As explained by Ivera's expert Karl Leinsing, Figure 66D



FIG. 66D

of the '681 Patent shows the sealing member 3090 engaged with the interior edge of the opening of the lumen 2022 at the tip 2021 of the male Luer post, having deformed around that edge so that the sealing member and edge of the opening are interlocked. (A1143–A1144, ¶ 32).

Such engagement of the movable member against the interior edge of the opening to the lumen requires the exertion of some force, which is provided

throughout the specification by a "biasing member" that firmly presses the movable member against the tip of the male post.  As explained by Mr. Leinsing, the accused Curos Tips product does not have any such biasing member pushing it back against the tip of the male post.  (A1136, ¶ 15; A1144, ¶ 33).  When the tip of the male post makes contact with the top of the plunger in the accused Curos Tips product, it presses it down but there is no return force to create an engagement between the top surface of the plunger and the opening of the lumen.  Accordingly, and contrary to the district court's order, the accused Curos Tips product does not "engage against" anything and thus does not infringe claims 1 and 18 of the '681 patent.  (A1144, ¶ 33).

2.  <u>The Term "Diminish Flow" Does Not Include Elimination of Flow</u>.

Claims 1 and 18 of the '681 Patent further require the engagement against the interior edge of an opening to the lumen to:

> <u>diminish flow</u> of the antiseptic agent into the lumen while permitting flow of the antiseptic agent past the member to the post of the male luer-lock connector.

(A127).  The district court erred in construing this term, "diminish flow" to mean "to reduce the flow, including to zero" instead of adopting Ivera's construction "diminished flow but not zero flow." (A13–A14).  A person of ordinary skill in the art at the time of the invention would understand the claim requirement to

"*diminish flow* of the antiseptic agent into the lumen" to require some reduction in flow, but not elimination of all flow.  Complete elimination of any flow is not a "diminished flow," it is zero flow.  (A1144, ¶ 45–A1146, ¶ 39).

In adopting Catheter Connections' proposed construction, the district court cites the summary of the invention where it states that the cap "can be configured to create a seal with the male protrusion so as [to] (sic) prevent antiseptic from entering a lumen of the male protrusion."  Relying on this reference to preventing flow, the district court concluded that "diminish flow" includes no flow. (A14).  Yet, if the applicant desired to claim the complete elimination of flow, it would not have used the term "diminish flow," which indicates some amount of continued flow, albeit at a lower rate.  The district court erred as a matter of law in construing "diminish flow" as synonymous with "zero flow."

The Tips product is designed to prevent the flow of alcohol into the lumen of the male connector, not to diminish such flow.  A flow rate of zero is not a "diminished flow," it is zero flow.  (A1146, ¶ 39).  Thus, there is no evidence that the Tips product satisfies this claim limitation, and there is no evidence that the Tips product infringes claims 1 and 18 of the '681 Patent.

### 3. A "Recess" Is Not Formed By Creating Two Elevations With a Lower Area Between Them.

Claim 1 of the '308 Patent states, in part:

43

> [A]nd the gripping portion comprising at least one <u>recess</u> having a length and depth, wherein the depth varied [sic] monotonically along the length of the <u>recess</u>

(A216). The district court agreed with a construction proposed by Catheter Connections that a "recess" includes: (i) "An indentation or cleft" or (ii) "A space in between two elevations" that is "Created by digging material out or removing material or by creating two elevations." (A14) The district court rejected Ivera's proposed construction based on the plain meaning of the term recess to be "an area where material has been removed to create a hollow." (A14).

By including a "space between two elevations," the district court's construction is contrary to the ordinary meaning of "recess" as used by a person of ordinary skill in the art. The plain meaning of the term "recess" does not include a space between two elevations built up from a surface. A person of ordinary skill in the art at the time of the invention would recognize a well-understood distinction between a "recess" which is made by removing material from the body of an object and "ribs" or protrusions which are made by adding material to the body of an object.

In support of this ordinary meaning, Ivera's expert Karl Leinsing confirmed that the difference between a recess and ribs is an important distinction to persons of skill in the art that impacts how a device is designed and modeled using

44

computer aided design ("CAD") software.  (A1147, ¶ 42).  It is undisputed that the gripping feature on accused Curos Tips is formed not by removing material from the cap body to create a recess, but rather by adding ribs extending out from the cap body, as seen in the following series of CAD images showing the buildup of the ribs from left to right:



Thus, the accused Curos Tips product does not have a gripping feature with recesses as required by claim 1 of the '308 patent.  (A1147–A1147, ¶¶ 43–45).

In support of its construction, the district court notes that the patent distinguishes between "protrusions and grooves, but states that they serve the same purpose."  (A15).  This is not, however, a means plus function claim element – this claim expressly requires a recess, not protrusions.  As shown above, the Tips product does not have any recesses and thus does not infringe on claim 1 of the '308 Patent.

**B. The Court Erred In Finding that Catheter Connections Met Its Burden to Show a Likelihood of Success On Infringement of the '308 Patent.**

A party seeking to prove literal infringement must demonstrate that the accused device meets each and every element of the asserted claims of the patents-in-suit. *Southwall Technologies, Inc. v. Cardinal IG Co*., 54 F.3d 1570, 1575 (Fed. Cir. 1995). If even one element of a claim is not met, a party is not liable for infringement. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir. 1991). The burden rests on the patent holder to show that each element is met. *Id*. A district court is similarly bound and must set forth findings and conclusions which clearly articulate how each element of an asserted claim is met. *Golden Blount, Inc. v. Robert H. Peterson Co*., 365 F.3d 1054, 1060 (Fed. Cir. 2004). Here, Catheter Connections did not meet its burden of proof with respect to establishing infringement of claim 1 of the '308 patent, and thus the district court's unsupported finding of a likelihood of success with respect to this claim must be reversed.

Claim 1 of the '308 Patent requires a "gripping portion comprising at least one recess having a length and depth, wherein the depth varie[s] monotonically along the length of the recess…." (A216) (emphasis added). Catheter Connections failed to offer *any* evidence whatsoever that the accused

the accused Curos Tips device includes a recess in which the "<u>depth varie[s]</u> <u>monotonically along the length of the recess</u>."  Catheter Connections did not offer a single measurement establishing the depth of the alleged "recess" at any point, much less establishing that such depth varied "monotonically" along its length.

The parties agree that the term "monotonically" means "varying in such a way that it either decrease or stays the same and never increases or increases or stays the same and never decreases." (A1018).  This element requiring a recess having a depth that varies monotonically along its length was added by examiner's amendment in order to overcome a rejection based on prior art. (A1139, ¶ 21).  In order to establish this element, Catheter Connections was under an obligation to show – even under the district court's construction – that the "depth" of the "recess" of the accused device varies monotonically along its length.

Such a variation in the depth of the recess cannot be established without some measurement of the depth of the recess.  Nowhere in the record, however, did Catheter Connections submit any such measurement at any location along the alleged "recess."  As a result, there is a complete failure of proof as to this element.  Absent proof that the accused device met this

element, there was no basis for the district court – which also failed to articulate any factual basis for its conclusion that Catheter Connections is likely to succeed in proving infringement of this claim – to conclude that the accused Curos Tips product likely infringes Claim 1 of the '308 Patent.

Moreover, the only actual evidence in the record regarding the depth of the alleged recesses in the accused device establishes that those alleged recesses do *not* vary monotonically along their length.  Based upon the district court's construction, the "recess" is defined at its height by the ribs of the device.  The "depth" is, then, the distance from the top of the rib – or the high point – to the bottom of the recess. As shown in the image below, the ribs begin at a point roughly halfway between the open end of the cap (at right) and the closed end of the cap (at left). The ribs extend toward the closed end of the cap, initially maintaining a relatively consistent height, then curving down toward the closed end of the cap. The body of the cap between the ribs is a conical shape, tapering consistently to a point near the closed end of the cap, and then rounding off to meet at the closed end of the cap.



Starting from the left end of the image above, the "depth" of the space between the ribs initially increases as the ribs curve upward to their maximum height, reaching its deepest point at or near the point where the rib flattens out. Once the rib flattens out, however, the depth of the recess decreases as the diameter of the cap body increases until the "depth" of the space between the ribs goes to zero at the point where the ribs begin.

This image establishes that the depth of the space between the ribs on the accused Curos Tips product does ***not*** vary monotonically. Rather, it first increases as you move from the closed end toward the open end, and then decreases. Thus, the accused product does not meet every element of claim 1 of the '308 patent. Catheter Connections completely failed to meet its burden of proof, and the district court's finding of a likelihood of success with respect to claim 1 of the '308 patent was clearly erroneous.

### C. The Court Erred In Its Conclusion that Ivera Failed to Present a Substantial Question as to Invalidity.

Pursuant to 35 U.S.C. § 103:

A patent for a claimed invention may not be obtained ... if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before

the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

The inquiry is "whether the subject matter would have been obvious to a person of ordinary skill in the art at the time of the asserted invention." *In re Kahn,* 441 F.3d 977, 985 (Fed. Cir. 2006). "Although the incentive to combine may be inferred from the nature of the problem," *K–Tec, Inc. v. Vita–Mix Corp.,* 729 F.Supp.2d 1312, 1325 (D. Utah 2010), "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn,* 441 F.3d at 988. Notwithstanding the fact that the claimed features of the patents-in-suit were apparent in all respects from prior art not before the Patent Office during prosecution, the district court summarily disregarded Ivera's challenges to the Patents' validity.

1. The District Court Erred In Concluding that Ivera Failed to Raise a Substantial Question that Claims 1 and 18 of the '681 Patent Are Invalid as Obvious.

The district court discounted Ivera's evidence of obviousness stating that Ivera identified "only three prior art references ... that contained the claimed elements of claims 1 and 18." (A18). Yet, the district court failed to provide any explanation as to why the prior art references relied on by Ivera are insufficient to raise a substantial question as to invalidity.

The file history of the '681 patent indicates that the element of claims 1 and

18 that distinguished over the prior art of record and led to allowance was added by

amendment, and requires:

> a member movably disposed within the chamber, the member shaped
> to enter the lumen so as to engage against an interior edge of an
> opening of the lumen when the post is received into the receiving
> portion to diminish the flow of the antiseptic agent into the lumen
> while permitting flow of the antiseptic agent past the member of the
> post of the male luer-lock connector.

(A1139-1140).  This was required to overcome prior art including, in particular,

the Peluso reference, U.S. Patent No. 4,624,664. (A1140; A1195-A1201).  Thus,

allowance was based specifically on the lack of prior art disclosing this

requirement of a movable member that engages against an interior edge of an

opening to a lumen.

In support of its

obviousness arguments,

Ivera identified prior art

that clearly discloses such

an engagement of the



opening of the lumen of a male connector both by static and movable members.

For example, U.S. Patent No. 4,597,758 to Aalto, which issued on July 1, 1986,

expressly discloses a cap with a movable member that engages the opening of the

lumen to prevent the flow of fluid through the opening.   (A1210-A1218).

The Aalto reference discloses a cap for attachment to a male connector that has a member (68) movably disposed within the chamber.  The member is shaped to enter the lumen so as to engage against an interior edge of an opening of the lumen when the post is received into the receiving portion.  This engagement is shown in a slightly different embodiment in Fig. 5 above, as the top (55) of movable member (36) engages the interior edge of the opening of the lumen (60) of a male luer connector. (A1140–A1141, ¶ 25).

Another example is U.S. Patent No. 5,184,742 to DeCaprio. (A1140; A1203-1208).  The engagement feature that engages against the interior edge of the opening to the lumen of a male connection can be seen readily in this image from Figure 4 of DeCaprio at right.  (A1140, ¶ 24).   Thus, the prior art references clearly disclose all of the features of the invention claimed in claims 1 and 18 of the '681 patent.  Moreover, as Ivera's expert Karl Leinsing testified, it would have been obvious to one of ordinary skill in the art to combine these references to arrive at the claimed invention.  (A1141, ¶ 26).



FIG.4

Ivera presented evidence raising a substantial question that claims 1 and 18 of the '681 Patent are obvious and thus invalid, yet the district court failed to even

make any findings of fact in support of its conclusion that these claims are likely valid.

### 2. The District Court Erred In Concluding Ivera Failed to Raise a Substantial Question that Claim 1 of the '308 Patent Is Invalid as Obvious.

The district court similarly disregarded Ivera's evidence that claim 1 of the '308 Patent is invalid on grounds of obviousness because Ivera purportedly failed to demonstrate what features would need to be combined to create the male cap. (A18–A19). Again, the district court failed to provide any explanation as to why the prior art references relied on by Ivera are insufficient to raise a substantial question as to invalidity.

The file history of the '308 patent indicates that the element of claim 1 that distinguished over the prior art of record and led directly to allowance was added by examiner's amendment, and requires a "gripping portion comprising at least one recess having a length and depth, wherein the depth varied monotonically along the length of the recess." The examiner had found all of the remaining elements of claim 1 of the '308 in the prior art references. (A1139).

But, as explained by Mr. Leinsing, numerous prior art caps for male luer connectors dating back to at least the year 2000 included such a gripping portion with a recess (as that term has been construed by the district court) having a depth

that varies monotonically along its length. (A1133, ¶ 7; A1137–A1139, ¶ 20). As set forth in the claim chart in Mr. Leinsing's declaration, such prior art caps include every element of claim 1 of the '308 patent except the presence of a disinfecting agent. (A1137–A1139, ¶ 20).

Those prior art protective caps, combined with known prior art disinfecting caps containing the remaining features of the claimed invention render claim 1 of the '308 patent invalid. Other prior art references such as the Baxter MiniCap disclose the use of a disinfecting agent in such a cap, and it would have been obvious to one of ordinary skill in the art to combine these prior art references to arrive at the claimed disinfecting cap. (A1139, ¶ 21).

Again, Ivera presented substantial evidence establishing that claim 1 of the '308 patent is likely invalid as obvious, but the district court simply dismissed this evidence without any analysis or the requisite findings of facts and conclusions of law.

## II.    THE DISTRICT ERRED IN CONCLUDING THAT CATHETER CONNECTIONS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

The law is clear that mere likelihood of success on the merits of claims is not sufficient to warrant a preliminary injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1350 (Fed. Cir. 2001). A plaintiff seeking

injunctive relief must also prove that it will be imminently and irreparably injured if the accused infringement persists. *Id*. The law no longer presumes that the victim of patent infringement will be irreparably harmed. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 (Fed. Cir. 2011). Rather, the burden is on the moving party to demonstrate that it will, in fact, be so harmed. *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013).

### A. <u>Catheter Connections' Long Delay Undercuts Any Claim of Irreparable Harm.</u>

A preliminary injunction is extraordinary relief, to be granted only where there is an urgent need for speedy action to protect a party's rights. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). It is well established that "delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (citing *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988)).[1] Delay – particularly a lengthy

---

[1] *See also GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)("[d]elay in seeking relief, however, undercuts any presumption that infringement alone has caused irreparable harm pendente lite ... and suggests that there is, in fact, no irreparable injury."); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (seven month delay before seeking a preliminary injunction at least suggests that the *status quo* does not irreparably damage plaintiff); *T.J. Smith & Nephew Ltd. v.*

delay – undercuts a party's claim that it requires urgent relief to prevent irreparable harm.

Here, the undisputed evidence established that Catheter Connections delayed in filing a motion for injunctive relief by twenty (20) months from the date it filed its first patent infringement case against Ivera's male cap product on June 5, 2012, by eighteen (18) months from the filing of its second patent infringement action against Ivera's male cap product, and fourteen (14) months from the filing of its third patent infringement action just days after the commercial launch of the exact same Curos Tips product at issue in this case. (A27).

Thus, Catheter Connections elected not to seek an injunction at any point during a six (6) month period prior to the launch of Curos Tips in December 2012 – at a point in time when it could have prevented *any* harm from the alleged infringement.  It then elected not to seek a preliminary injunction based on any of its three (3) previously asserted patents for fourteen (14) more months after the launch of the accused Curos Tips product.  This delay – which allowed Ivera to launch its accused Curos Tips product and build a market for

_____

*Consol. Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (15 month delay plus grant of licenses by patentee sufficient to overcome presumption of irreparable harm).

disinfecting caps for male connectors that has profoundly benefitted Catheter

Connections – completely undercuts Catheter Connections' current claim of

urgent irreparable harm.

Catheter Connections' decision not to seek a preliminary injunction in

the prior proceedings was driven purely by legal strategy.  In the district court,

Catheter Connections argued that the claims of the patents asserted in its earlier

cases were narrower, making it more difficult for Catheter Connections to

prove likelihood of success on the merits.  (A27).  The alleged irreparable

harm has not changed since June 2012.  Catheter Connection just obtained new

continuation patents in the '681 and '308 patents that it believes are easier to

enforce.

The district court accepted this rationale, finding that because the

currently asserted patents are "broader and 'more amenable to consideration in

an expedited proceeding,' Catheter Connections could not reasonably have

brought a motion for injunctive relief any sooner than it did, and it was

reasonable for it to not file for preliminary injunction in the other prior

actions."  (A28).   The district court's finding that Catheter Connections' delay

was justified on this basis is clearly erroneous.

The harm faced by Catheter Connections in February 2014 when it finally sought this preliminary injunction was not materially different than the harm it faced in 2012 when it filed its first three (3) patent infringement cases. In fact, in 2012 the urgency and risk of irreparable harm were far more significant as Ivera was preparing to launch its accused infringing, competing Curos Tips product. Thus, a preliminary injunction in 2012 could have preserved the status quo, maintained the exclusive market position held at that point by Catheter Connections, and prevented *all* of the harm it now claims is irreparable.

That Catheter Connections perceives the current patents as "more amenable to consideration in an expedited proceeding" is not a reasonable justification for delay, and does not alter the fact that the delay establishes a lack of urgency. Catheter Connections' determination that its earlier infringement claims were simply too weak to support an injunction motion is a legal strategy decision, not a justification for delay.

Notably, Catheter Connections continues to maintain its earliest-filed patent infringement action – the 531 case – against the very same accused product, apparently viewing its prospects for success favorably. (A1323, ¶ 27). The extent of Catheter Connections' delay – extending for nearly two years

during which time Ivera launched and then built a market for male caps

product – undercuts Catheter Connections' assertion of urgent irreparable

harm, and the Court made no finding that any current circumstance establishes

any new urgency.  (A1322, ¶¶ 23–24).

Delay in seeking an injunction goes to urgency.  Regardless of the

strategic basis for that decision, Catheter Connections' decision not to seek an

injunction for nearly two years after filing its first patent infringement case

reflects a lack of the urgency that is essential to any grant of a preliminary

injunction.

### B. Catheter Connections' Claimed Injuries Are Compensable In Money Damages.

"The essence of showing irreparable harm is demonstrating an injury that

money damages cannot sufficiently remedy." *Celsis In Vitro, Inc. v. CellzDirect,*

*Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).  No evidence of such irreparable injury

was presented here.  Rather, Catheter Connections presented evidence that it

would be injured by lost market share, lost sales/profits, and price erosion.

Under the circumstances of this case, which involves only two market

participants, these are all injuries which are compensable and do not suffice to

support the Court's conclusion of irreparable harm.

CONFIDENTIAL INFORMATION REDACTED

As an initial matter, a probable loss in market share in and of itself does not amount to irreparable harm. *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991).  Indeed, for the loss of market share to support a finding of irreparable harm, the loss must be substantial.  *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1324–25 (Fed. Cir. 2012).  Here, the district court relied on Catheter Connections' evidence of decreased market share over three quarters as proof of irreparable harm, despite a simultaneous increase in revenue. (A23).  Here, both loss of market share and lost sales or profits are, however, compensable by calculable monetary awards.

In a two-player market, lost market share and injury from lost sales are particularly easy to quantify. ██████████████████████████████████ ██████████████████████████████. (A385–A386; A1127; A1236). ███████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████. (A1236). ██████████████████████████████████████████████████ ████████████████████ (A1236). ████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████ (A24).

CONFIDENTIAL INFORMATION REDACTED

Thus, any gain in Ivera's market share can be quantified as Catheter Connections' loss.  Catheter Connections' purported harm in the form of loss of market share proves plainly compensable with monetary damages. The district court's finding of irreparable harm represents a clear error of judgment.

As with loss of market share and lost sales, in a simple two-participant market even price erosion proves calculable and, consequently, economically compensable.  ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ (A1237).  Alternatively, price erosion may be compensated through a royalty to be paid by a hypothetical licensee.  ███████████████████████████████████

████████████████████████████████████████████

████████████████████. (A1237).

In fact, the district court recognized as much, noting that ██████████

████████████████████████████████████████████████

███████████████████████████████████████████████

As such, the numbers necessary to determine Catheter Connections' purported damage from price erosion prove readily available.  █████████████████████

CONFIDENTIAL INFORMATION REDACTED

 (A25).

In fact, the record in this case is devoid of any evidence of price erosion for the relevant products. ████████████████████████████████ ████████████████████████████████. (A1246). ████████████████████████████████ ████████████████████████████████ ████████████████████████████████. (A1246–A1247; A386–A387, ¶ 22).

While infringement – if eventually proven – may result in injury to Catheter Connections, the evidence does not support a conclusion that the injury claimed would be incalculable and, thus, irreparable.  In fact, because only Ivera and Catheter Connections participate in the relevant market the opposite is true. Accordingly, the district court's conclusion that Catheter Connections met its burden to show irreparable harm is in error.

**C. The District Court Failed to Address the Causal-Nexus Requirement that Irreparable Harm Be Caused By the Infringement.**

Where the injunctive relief sought will not enjoin the source of the harm, an injunction proves an unwarranted remedy.  *See, e.g., Apple Inc. v. Samsung*

*Electronics Co., Ltd.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013); *see also Buckingham Corp. v Karp*, 762 F.2d 257, 262 (2d Cir. 1985). Catheter Connections, thus, needed to demonstrate a "causal nexus between [the defendant's] infringement and the alleged harm to [the movant] as part of the showing of irreparable harm." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013) (quotations omitted). "More fundamentally, the purpose of the causal nexus requirement is to show that the patentee is irreparably harmed *by the infringement.* Without such a showing, it is reasonable to conclude that a patentee will suffer the same harm with or without an injunction, thus undermining the need for injunctive relief in the first place." *Id.* at 1363 (emphasis in original).[2] The corollary to this

---

[2] *See also Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) ("The linchpin of such interim relief is that threatened irreparable harm will be prevented by that injunction."); *Foy v. Univ. of Texas at Dallas*, CIV.A. 3:96-CV-3406P, 1997 WL 279879, *2, n. 1 (N.D. Tex. May 13, 1997) *aff'd sub nom. Foy v. Univ. of Texas*, 146 F.3d 867 (5th Cir. 1998) ("Plaintiff has not shown that granting the requested injunction will remedy the irreparable injury of which he complains ...."); *Local No. 1 (ACA), Broad. Emp. of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 419 F. Supp. 263, 286 (E.D. Pa. 1976) ("Thus, the appropriate question is, in effect, whether plaintiffs have shown that an immediate but temporary merger with Local 107, pendente lite, would cause them irreparable injury); *Seto v. Thielen*, CIV. 10-00351, 2010 WL 2612603, *2 (D. Haw. June 28, 2010) ("[T]he requested injunction would not necessarily prevent irreparable harm to [movant] as the [harmful condition] would continue with or without [the injunction].").

CONFIDENTIAL INFORMATION REDACTED

principle is that a cessation of infringement must suffice to avoid the claimed irreparable harm. *Id*. at 1362. This is not the case here.

Although Ivera dedicated significant efforts to demonstrating that Catheter Connections' purported irreparable harm did not connect specifically to the alleged infringement, the district court completely ignored this nexus requirement. Catheter Connections, however, has completely failed to demonstrate that its injury could be avoided through the cessation of claimed infringement.

First, Catheter Connections claims its irreparable harm stems from lost sales to Ivera. █████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████ (A1229). █████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ (A1229–A1230).

█████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

CONFIDENTIAL INFORMATION REDACTED



(A1231).

(A1231).

Second, Catheter Connections claimed it will suffer irreparable harm by losing out on group purchasing organization ("GPO") contracts.

(A1230–A1231).

(A1306, ¶ 25).

The alleged irreparable harm asserted by Catheter Connections was and is

CONFIDENTIAL INFORMATION REDACTED

the result of ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████ (A396–A398, ¶¶ 53–60).

███████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████ (A397, ¶ 56). ████████████████████

█████████████████████████████████████████

███████████████████████████████████████ (A1098).

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ (A397, ¶ 57).

    Catheter Connections' own decisions demonstrate the lack of the requisite

causal nexus to justify an injunction.  That is, ██████████████████████

██████████████████████████████████████

CONFIDENTIAL INFORMATION REDACTED

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION IN SETTING THE BOND AMOUNT.

Fed. R. Civ. P. 65(c) requires a bond to be set in an amount "proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Ivera provided evidence that it will potentially suffer harm in the millions of dollars.  (A2391– A2392, ¶ 17).  ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████ (A2403– A2405, ¶¶ 3–5).

The district court even acknowledged this, recognizing that "Ivera has set forth the significant losses it will suffer in the event that the preliminary injunction was issued in error."  (A37). Yet, the district court failed to make any findings of fact regarding the proper amount necessary to provide security in accordance with Fed. R. Civ. P. 65(c) and instead set the bond at $250,000.00. (A37–A38).

In direct contravention to Fed. R. Civ. P. 65(c), the Court based its $250,000.00 bond amount on its assessment of Catheter Connections' ability to post a bond and acknowledged that the amount was insufficient to protect Ivera's interests.  (A37).  Thus, the Court's own analysis of the evidence regarding the

damage that Ivera will suffer because of an injunction establishes that the bond set by the Court is insufficient.

"Because the amount of the bond is an ***upper limit*** on an injured party's redress for a wrongful injunction, courts have held that 'district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 *opinion amended on denial of reh'g,* 209 F.3d 1032 (7th Cir. 2000) (emphasis added). This reflects the fact that "an error in [setting the bond too low] produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *United States v. Roth*, 201 F.3d 888 (7th Cir. 2000).

Ivera has no solace in the Court's indication that if the Court was wrong in granting the injunction "Ivera will have the opportunity to recover a judgment from Catheter Connections' ongoing business." (A38). Assuming that Catheter Connections stays in business through the conclusion of the appeal, Ivera cannot recover any such judgment from Catheter Connections. The amount of the bond fixes the ceiling for Ivera's recovery as a matter of law. *See W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers*

*of Am.*, 461 U.S. 757, 770 n. 14, 103 S. Ct. 2177, 2185 n. 14, 76 L. Ed. 2d 298

(1983).[3]

The district court ignored the evidence and the requirements of Fed. R. Civ.

P. 65(c) and established a bond of just $250,000.00 – far below Ivera's potential

damages under any measure – based on Catheter Connections' alleged inability to

finance a bond any larger. (A37). This bond determination is not supported by

any factual findings, was contrary to law and an abuse of discretion, and should be

vacated by this Court. *See Davis v. United States*, 192 F.3d 951, 961 (10th Cir.

1999)("without factual findings, this court cannot determine whether the district

court abused its discretion in setting the bond amount for the preliminary

injunction and must be remand for such findings").

## IV.    THE DISTRICT COURT ERRED IN FAILING TO MAKE ADEQUATE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

In granting an interlocutory injunction, the district court "must find the

facts specially and state its conclusions of law separately." Fed. R. Civ. P.

52(a)(1) and (2). "It is of the highest importance to a proper review of the

---

[3] *See also Coyne-Delany Co., Inc. v. Capital Dev. Bd. of State of Ill.*, 717 F.2d 385, 394 (7th Cir. 1983)("A defendant's inability to obtain damages in excess of the bond unless the plaintiff was acting in bad faith can have unfortunate results, which are well illustrated by this case where the district court required too small a bond.").

action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52(a) of the Rules of Civil Procedure." *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316, 60 S. Ct. 517, 84 L. Ed. 774 (1940); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 712 n.10 (3d Cir. 2004); *see also Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991). "Absent appropriate findings, the normal course is to vacate the district court's decision and remand the matter for a proper analysis." *Warner Chilcott Labs., et al. v. Mylan Pharm. Inc.*, 451 F. App'x 935, 940 (Fed. Cir. 2011) (citing *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010)); *Pretty Punch Shoppettes, Inc. v. Hauk*, 844 F.2d 782, 785 (Fed. Cir. 1988)).

Notwithstanding this mandate, the district court failed to adequately state its findings of fact and conclusions of law in support of its decision granting the preliminary injunction. (*See* A1–A33). In fact, the Court completely failed to "find the facts specially and state its conclusions of law separately" as required by Rule 52(a). (*Id.*). This failure permeates every issue addressed by the district court.

For example, on the merits of the infringement and validity issues, the Court simply summarized the parties' respective positions and then stated its conclusion of infringement. (A16–A18). In fact, in the entire discussion of

70

patent infringement – the central issue on the merits – the Court offers only one statement that can be characterized as something akin to a finding of fact, proclaiming, "The Curos Tips meet the 'recess' limitation." (A17).  With respect to the '681 patent, the Court's entire discussion consists of a summary of each party's arguments, and the single sentence: "The court concludes that Ivera's Curos Tips product infringes claim 1 and claim 18 of the '681 patent." (A17).  There is no factual basis stated on which to assess how the district court concluded that each element of the claims asserted was met.

The district court's order is similarly abbreviated with respect to findings on validity. Ivera raised obviousness challenges to claims 1 and 18 of the '681 patent and claim 1 of the '308 patent – the three claims that provide the basis for the injunction.  In its filings, Ivera identified specific prior art references and combinations that establish likelihood that the asserted patent claims are invalid.  (A1133–A1135, ¶¶ 7–11; A1137–A1141, ¶¶ 20–26).  Obviousness is a question of law, based on underlying factual determinations. *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012).  Factual determinations necessary to the obviousness analysis include the scope and content of the prior art; the differences between the prior art and the claims at issue; the level of ordinary skill in the field of the invention; and objective considerations such as commercial

success, long felt need, and failure of others. *Id*. at 1351. Any inherent teaching of

a prior art references is a question of fact. *In re Napier*, 55 F.3d 610, 613 (Fed.

Cir. 1995).

Thus, consideration of the merits of Ivera's obviousness defenses ***required***

specific findings of fact and conclusions of law that are completely absent from the

district court's order granting the preliminary injunction motion. (*See* A1–A33).

Instead, the district court dismissed Ivera's arguments by stating that it had

provided "few specifics about what would have motivated an ordinary person

skilled in the art to combine the various elements." (A18–A19). Without a factual

finding, the district court concluded that Ivera has not "show[n] a likelihood of

establishing that Catheter Connections' male cap is invalid for obviousness."

(A19). Not only is this conclusion flawed in its reference to the validity of the

product, the district court offers no analysis to support such a conclusion assuming

it was properly directed to the patent claims rather than the product. (A18–A19).

Because the district court's order granting Catheter Connections' motion for

preliminary injunction based on alleged patent infringement fails to "find the facts

specifically and state its conclusions of law separately" as required by Rule

52(a), it should be vacated and remanded for such findings.

## CONCLUSION

Based on the foregoing, Ivera respectfully requests a reversal of the preliminary injunction and the order setting the bond amount for the same.

Respectfully submitted,

Dated: June 30, 2014

/s/ Jon Hangartner
Jonathan Hangartner
X-Patents, APC
5670 La Jolla Blvd.
La Jolla, California 92037
Telephone: (858) 454-4313
jon@x-patents.com

*Attorney for Defendant-Appellant*
*Ivera Medical Corporation*

73

# ADDENDUM

Nathan D. Thomas
JONES WALDO HOLBROOK & MCDONOUGH (SLC)
170 S MAIN ST STE 1500
SALT LAKE CITY, UT 84101

REDACTED VERSION OF SEALED DOCUMENT -- UNREDACTED FILED WITH
CONFIDENTIAL BRIEF

## Other Orders/Judgments
2:14-cv-00070-TC Catheter
Connections v. Ivera Medical

JURY,OPEN_MJ,PATENT

[ Print Mailing Packets ]

### US District Court Electronic Case Filing System

### District of Utah

## Notice of Electronic Filing

The following transaction was entered on 4/14/2014 at 11:34 AM MDT and filed on 4/14/2014

**Case Name:**          Catheter Connections v. Ivera Medical
**Case Number:**        2:14-cv-00070-TC
**Filer:**
**Document Number:** 83

**Docket Text:**
**ORDER AND MEMORANDUM DECISION (SEALED) granting [30] Sealed Motion for Preliminary Injunction. Signed by Judge Tena Campbell on 4/14/2014. (jwt)**

**2:14-cv-00070-TC No electronic public notice will be sent because the case/entry is sealed.**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1060034973 [Date=4/14/2014] [FileNumber=2788069-0
] [6aa7dc31471adccef396329383261022e0070d928b095123fbb117fb4b241bc4e81
64ff756f63c4832afaccde2bf7ac2ce3d5b974eb2d80db1c1b6fa4ef5392c]]

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CATHETER CONNECTIONS, INC., a Delaware corporation,<br><br>             Plaintiff,<br><br><br>             vs.<br><br><br>IVERA MEDICAL CORPORATION, a California corporation,<br><br>             Defendant. | **ORDER and**<br>**MEMORANDUM DECISION**<br><br><br><br><br>Case No. 2:14-CV-70 |

Catheter Connections, Inc. (Catheter Connections) is the owner of several patents for male disinfecting caps that are used to cover and disinfect the male luer post of an intravenous infusion line. Catheter Connections has sued Ivera Medical Corporation (Ivera) alleging, among other things, that Ivera's male disinfecting cap, the Curos Tips, infringes claims of two of its patents, U.S. Patent 8,647,308 B2 ('308 patent) and U.S. Patent 8,641,681 B2 ('681 patent).

Catheter Connections has moved for a preliminary injunction. Because the court concludes that Catheter Connections has shown that the four preliminary injunction factors weigh heavily and compellingly in its favor, as described below, the court GRANTS Catheter Connections' motion.

FACTUAL BACKGROUND

Catheter Connections makes disinfecting caps for both ports–the male luer and the female luer access valve (LAV)–on an intravenous (IV) catheter line. The LAV is a connector or port

that attaches to the patient to administer medications or withdraw blood. The male luer is found at the end of the IV line which is typically connected to an IV bag filled with medicine and/or fluid. When the LAV and the male luer are detached, both ends are exposed to contaminants, bacteria, fungi, and other microorganisms. The caps are designed to disinfect the male luer and the LAV and protect them against recontamination between uses.

Current practice requires that the LAV be disinfected before use. Before the creation of the disinfectant cap, nurses would attempt to disinfect the LAV by rubbing the surface of the LAV with an alcohol pad and letting it dry before connecting it to a patient line. There was no method to disinfect the male luer without the risk of introducing toxic disinfectants into the fluid pathway.

In 2009, Ivera became the first company to introduce a disinfecting cap for LAVs. LAV caps have now become an accepted technology in the medical industry with several companies marketing and producing their own LAV disinfecting cap. But the market for male disinfecting caps is much smaller. Catheter Connections was the first company to market, obtain patent protection, and receive FDA clearance for its male disinfectant cap. Ivera started developing its own male luer cap in 2011. Catheter Connections and Ivera are currently the only two competitors in the male cap market. Only the male disinfecting cap is at issue in this case.

The male cap involves more complex engineering than the LAV cap because of the risk of toxic disinfectant entering the male luer's open fluid pathway and ultimately the patient. To use the male disinfectant cap, the cap is screwed onto the male luer end. When the male cap is screwed onto the male luer, the male luer post presses against a sealing component, which seals and blocks the flow of isopropyl alcohol from entering the fluid pathway of the male luer post.

Once sealed, the isopropyl alcohol is released and flows over the outer surface of the male luer post to disinfect it.

Group Purchasing Organizations (GPOs) represent groups of hospitals and other healthcare facilities that negotiate together for medical device supply contracts. Once a vendor is on a GPO contract, the members of the GPO are generally required to purchase medical products from that vendor, unless the product qualifies as "new technology" not otherwise available under the contract. Disinfecting caps are no longer considered "new technology" because all five GPOs either have contracts in place or are currently in the process of establishing contracts for disinfecting caps.

GPO contracts tend to be driven by LAV cap demand because the LAV cap came to the market before the male luer cap, LAV caps are used more often than male caps, and some hospitals and healthcare providers are not aware of or concerned with the need to disinfect the male luer. And while a GPO contract does not always guarantee[1] sales, the GPO members will often refuse to consider purchasing the products of other suppliers without a contract. For these reasons, entry into the market is greatly dependent on a supplier obtaining GPO contracts.

---

[1] The parties often refer to the GPO contracts as "hunting licenses." (See e.g., Borch Decl. ¶ 2, Docket No. 65; Lloyd Decl. ¶ 27, Docket No. 53.)

3

LITIGATION HISTORY[2]

Catheter Connections filed its first action against Ivera related to the male cap technology on June 5, 2012.[3] Catheter Connections alleged that Ivera had "promoted, sold, prepared or offered to sell" a male luer disinfecting cap that infringed Catheter Connections' U.S. Patent 8,172,825 ('825 patent).[4] On July 31, 2012, Catheter Connections filed another action against Ivera asserting patent infringement of U.S. Patent 8,231,587 ('587 patent) because Ivera was "making, using, offering to sell and/or selling" infringing male caps.[5] Both of these cases involved Ivera's prototype male cap, the X10, and were consolidated on November 13, 2012.

On December 8, 2012, Catheter Connections filed its third patent infringement action against Ivera.[6] The complaint asserted infringement of U.S. Patent 8,328,767 ('767 patent). Catheter Connections alleged that Ivera "making, using, and/or currently offering to sell Curos Tips" infringed the '767 patent.[7]

---

[2]Before Catheter Connections filed suit against Ivera for infringement of its male cap patents, Ivera sued Catheter Connections alleging patent infringement of its LAV cap patents. In April 2012, Ivera filed its first complaint against Catheter Connections in the Southern District of California alleging infringement of U.S. Patent 7,780,794 and U.S. Patent 7,985,302, Case No. 3:12-cv-954 ('954 case). In June 2012, Ivera filed a second complaint in the Southern District of California allegining infringement of U.S. Patent 8,206,514, Case No. 3:12-cv-1587. This case was then consolidated into the '954 case.

[3]See Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-531-DN.

[4]Complaint in Case No. 2:12-CV-531-DN, Docket No. 2.

[5]Complaint in Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-748-DN, Docket No. 1.

[6]Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-1127-DB.

[7]Complaint in Case No. 2:12-CV-1127-DB, Docket No. 1.

4

On October 4, 2013, Catheter Connections dismissed its claims against Ivera for infringement of the '587 and '767 patents. Catheter Connections' claim of infringement of the '825 patent remains pending.

Catheter Connections did not file a motion for injunctive relief in any of these earlier cases.

## ANALYSIS

### I.     Standard for Injunctive Relief

The underlying purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). The court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.

A party seeking a preliminary injunction must establish: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) the impact of the injunction on the public interest." Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1356 (Fed. Cir. 2002) (quoting Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988)). To obtain injunctive relief, Catheter Connections bears the burden of establishing all four factors. See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148 n.3 (Fed. Cir. 2011).

A preliminary injunction is a "drastic and extraordinary remedy" and should not be routinely granted." Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting Intel. Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)).

5

Because a preliminary injunction is an extraordinary remedy, "the right to relief must be clear and unequivocal." Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005) (citation and internal quotation marks omitted).

When a preliminary injunction seeks to alter the status quo, like the injunction here, "a movant must demonstrate that 'on balance, the four [preliminary injunction] factors weigh heavily and compellingly in [the movant's] favor" before such an injunction may be issued. O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004) (quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991)) (emphasis added). A movant must also meet this higher burden if it seeks a preliminary injunction that is mandatory as opposed to prohibitory or when the preliminary injunction "affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." Id.

A preliminary injunction disrupts the status quo when it changes the "last peaceable uncontested status existing between the parties before the dispute developed," Beltronics USA, Inc. v. Midwest Inventory Distrib., 562 F.3d 1067, 1071 (10th Cir. 2009) (quoting Schrier, 427 F.3d at 1260), or seeks to alter "the state of affairs existing immediately before the filing of the litigation." Litton Sys., Inc. v. Sundstrand Corp., 750 F.2d 952, 961 (Fed. Cir. 1984). A court should be hesitant to grant the "extraordinary interim relief of a preliminary injunction in any particular case, but especially so when such an injunction would alter the status quo prior to a trial on the merits." O Centro, 389 F.3d at 977.

Here, Catheter Connections has moved for an injunction that changes the status quo. The injunctive relief Catheter Connections seeks does not preserve the status of affairs existing immediately before February 4, 2014, but returns to late 2012 before Ivera first began marketing

6

and producing its Curos Tips product. Moreover, the proposed injunction is mandatory in nature, since there is a real possibility that the court would have to supervise Ivera's compliance with an order to immediately halt a significant portion of its business operations and halt all future production and orders of the Curos Tips. See Schrier, 427 F.3d at 1260 (injunctions which affirmatively require a party to act in a certain way and may require court supervision are mandatory). Accordingly, the court must closely scrutinize Catheter Connections' request for injunctive relief, see O Centro, 389 F.3d at 979, and Catheter Connections must demonstrate that the preliminary injunction factors weigh "heavily and compellingly" in its favor. Id. at 977.

## II.    Preliminary Injunction

1.    Likelihood of Success

Catheter Connections contends that the Curos Tips product infringes claims 1 and 18 of the '681 patent and claim 1 and 7 of the '308 patent. The application for the '681 patent is a continuation of application No. 13/664,641, which is now the '308 patent. The two patents have identical drawings and specifications.

A.    Claim Construction

To evaluate whether Catheter Connections is likely to succeed on the merits, the court must first construe disputed terms of the asserted claims. The parties selected six terms for construction. (See Joint Claim Const., Docket No. 41.) But at the March 27-28, 2014 hearing, the parties informed the court that it need construe only four terms from the two patents. These terms are: (1) Engage against (claims 1 and 18 of the '681 patent); (2) Diminish flow (claims 1 and 18 of the '681 patent); (3) Cap body (claims 1 and 7 of the '308 patent); and (4) Recess (claims 1 and 7 of the '308 patent).

7

The asserted claims of the '681 patent read as follows (with the disputed terms underlined):

1.    A male-disinfecting cap for applying an antiseptic agent to a medical male luer-lock connector, of the type including a post having a lumen through which fluid flows and an internally helically threaded skirt surrounding the post, the cap comprising:

    a.    a receiving portion defining a chamber into which the post of the male luer-lock connector can be received, the chamber having only a single opening, the receiving portion defining an external surface having means for engaging helical threads of the internally helically threaded skirt, wherein the receiving portion is configured to fit within the skirt of the male luer-lock connector when the post is received into the receiving portion;

    b.    an antiseptic agent disposed in the chamber;

    c.    a member movably disposed within the chamber, the member shaped to enter the lumen so as to <u>engage against</u> an interior edge of an opening of the lumen when the post is received into the receiving portion to <u>diminish flow</u> of the antiseptic agent into the lumen while permitting flow of the antiseptic agent past the member to the post of the male luer-lock connector; and

    d.    a gripping portion.

18.    A male-disinfecting cap for applying an antiseptic agent to a medical male luer-lock connector, of the type including a post having a lumen through which fluid flows and an internally helically threaded skirt surrounding the post, the cap comprising:

    a.    a receiving portion defining a chamber into which the post of the male luer-lock connector can be received, the chamber having only a single opening, the receiving portion defining an external surface having means for engaging helical threads of the internally helically threaded skirt, wherein the receiving portion is configured to fit within the skirt of the male luer-lock connector when the post is received into the receiving portion;

    b.    an antiseptic agent disposed in the chamber;

    c.    a member movably disposed within the chamber, the member shaped to enter the lumen so as to <u>engage against</u> an interior edge of an opening of the lumen when the post is received into the receiving portion to <u>diminish flow</u> of the antiseptic agent into the lumen while permitting flow of the antiseptic agent past the member to the post of the male luer-lock connector.

8

('681 patent col. 55 ll. 31-52, col. 56 ll. 30-51.)

The asserted claims of the '308 patent read as follows (with the disputed terms underlined):

1.    A male-disinfecting cap for disinfecting a male luer-lock connector of the type including a post having a lumen through which fluid flows and an internally helically threaded skirt surrounding the post, the cap comprising: a cap body having an outer surface defining a gripping portion and only one receiving portion and defining a longitudinal axis, the receiving portion defining one chamber having a single opening, said opening being in the receiving portion, into which the post of the male luer-lock connector can be received, wherein an exterior surface of the receiving portion near the opening of the chamber fits within the skirt of the male luer-lock connector when the post is received into the single opening of the chamber, the exterior surface of the receiving portion having protrusions shaped to engage helical threads of the internally helically threaded skirt; the chamber defining an interior portion extending within the gripping portion of the cap body, wherein the gripping portion extends the cap body longitudinally beyond the skirt of the male-luer lock connector when the post is received into the chamber; and the gripping portion comprising at least one recess having a length and depth, wherein the depth varied monotonically along the length of the recess; and an antiseptic agent disposed in the chamber.

7.    A male-disinfecting cap for disinfecting a male luer-lock connector of the type including a post having a lumen through which fluid flows and an internally helically threaded skirt surrounding the post, the cap comprising: a cap body having an outer surface defining a gripping portion and only one receiving portion and defining a longitudinal axis, the receiving portion defining one chamber having a single opening, said opening being in the receiving portion, into which the post of the male luer-lock connector can be received, wherein an exterior surface of the receiving portion near the opening of the chamber fits within the skirt of the male luer-lock connector when the post is received into the single opening of the chamber, the exterior surface of the receiving portion having protrusions shaped to engage helical threads of the internally helically threaded skirt; the chamber defining an interior portion extending within the gripping portion of the cap body, wherein the gripping portion extends the cap body longitudinally and distally from the opening beyond the skirt of the male luer-lock connector when the post is received into the

9

> chamber; and the gripping portion comprising at least one recess having a
> bottom, the cap body having a cross sectional thickness at the bottom of
> the recess gradually increasing from a distal-most end of the cap body and
> towards the receiving portion; and
> an antiseptic agent disposed in the chamber.

('308 patent col. 55 l. 28 – col. 56 l. 6, ll. 18-44.)

    1.    "Engage against"

| Term | Catheter Connections' Proposed Construction | Ivera's Construction |
|---|---|---|
| "Engage against" | "Contacts or abuts." (Joint Claim Const., Docket No. 41 at 6.) | "Interlock or mesh with." (Id. at 7.) |

The court concludes that Catheter Connections is correct.

To define the scope of a claim, a court looks first "to the words of the claims." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Federal Circuit cautions "that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question . . . ." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Vitronics, 90 F.3d at 1582.

Here, Ivera's proposed construction reads out the word "against" and focuses only on the word "engage." In the '681 patent, claims 1 and 18's use of the phrase "engage against" is clearly different than in claim 11, where the claim reads ". . . wherein the means for engaging helical threads includes threading disposed on the receiving portion to engage with threads of the male

10

luer-lock connector." ('681 patent col. 55 ll. 12-15.) Further, the specification confirms that

"engage against" means "contact."

> In the illustrated embodiment [FIG. 38], <u>contact</u> between the tip **2021** and the sealing member **2290** occurs just prior to engagement of a connection **2012** of the connector **2000** with the connection interface **2242**. In other embodiments, the connection interfaces **2012**, **2242** can engage each other prior to <u>contact</u> between the tip **2021** and the sealing member **2290**.

('681 patent col. 32 ll. 49-52) (emphasis added).

> As shown in FIG. **41**, a tip **2021** of a male luer **2020** can be received within the disinfection chamber **2358** prior to <u>contacting</u> the sealing member **2390**. Stated otherwise, the sealing member **2390** can be recessed relative to a proximal end of the sidewall **2352** by a distance that is sufficiently great to permit at least a portion of the male luer **2020** to be received within the sidewall **2352** before the male luer <u>contacts</u> the sealing member **2390**.

('681 patent col. 34 ll. 44-53) (emphasis added).

> 2.    "Diminish flow"[1]

| Term | Catheter Connections' Proposed Construction | Ivera's Construction |
|---|---|---|
| "Diminish Flow" | "To reduce the flow, including to zero." (March 27, 2014 Hr'g Tr. at 10.) | "Diminished flow but not zero flow." (<u>Id.</u> at 11.) |

The court agrees with Catheter Connections' construction.

The summary of the invention states that in some embodiments that include an antiseptic in the cap, "it can be configured to create a seal with the male protrusion so as [to] (sic) <u>prevent</u> antiseptic from entering a lumen of the male protrusion." ('681 patent  col. 2  ll. 3-5) (emphasis added). Both claims 1 and 18 disclose antiseptic in the cap.

---

[1] The parties did not include this term as one needing construction until the hearing.

The use of the word "prevent" supports Catheter Connections' contention that "diminish flow" can include a zero flow.  And as Catheter Connections' counsel stated at the hearing, nothing in the specification supports Ivera's desired limitation that the flow of antiseptic cannot be zero.  "Diminish" can mean that some antiseptic is left, but it can also include no antiseptic or a zero antiseptic flow.

     3.     "Recess"[2]

| Term | Catheter Connections' Proposed Construction | Ivera's Construction |
|---|---|---|
| "Recess" | "An indentation or cleft." "A space in between two elevations." "Created by digging material out or removing material or by creating two elevations." (March 27, 2014 Hr'g Tr. at 38-39.) | "An area where material has been removed to create a hollow." (Id. at 41.) |

The court agrees with Catheter Connections.

     Ivera argues that the claim language supports a construction that a recess is only a recess when created by removing material from the cap body.  Ivera points to figures 1A and 1B in the '308 patent as showing "a groove cut into the cap body."  (Id. at 44.)  But Ivera is reading too much into the claim language and into the figures.  To accept Ivera's construction would be reading a limitation into the term that is not found anywhere in the patent.

     At the hearing, Ivera acknowledged that figure 1A showed a cap with "bumps or protrusions" and figure 1B was a cap with "grooves."  Ivera stated that the protrusions "are not

---

[2] The parties did not include this term in their joint claim construction pleading.

Case 2:14-cv-00070-TC    Document 83 *SEALED*    Filed 04/14/14    Page 13 of 31

recesses clearly." (Id. at 41.) But Ivera focused on the bumps and protrusions themselves, rather than the depressed areas between the elevations

The patent's description distinguishes between the protrusions and grooves, but states that they serve the same purpose: "[t]he uneven surfaces provided by the ridges **105** and the grooves **107** or protrusions **108** can facilitate rotational movement of the caps," ('308 patent, col. 6 ll. 38-40), and "the uneven surfaces may be easily gripped by the fingertips of a medical practitioner." (Id. ll. 43-44.) Claims 1 and 7 of the '308 patent specifically describe the gripping portion "comprising at least one recess" for the purpose of gripping and turning the cap, without differentiating between recesses created by cutting out material or by adding protrusions or elevated areas.

4.    Cap body[3]

| Term | Catheter Connections' Proposed Construction | Ivera's Construction |
|------|---------------------------------------------|----------------------|
| "Cap body" | "No need to construe. Ordinary meaning." (Joint Claim Const., Docket No. 41 at 8.) | "The main section of the cap." (Id.) |

After the joint claim construction brief was filed, Ivera proposed that for claim 7 of the '308 patent, the proper construction for the term cap body is "cap body have a cross sectional thickness," meaning that the thickness of the cap body wall gradually increases from the end of the cap farthest from the opening towards the receiving portion. (Def.'s Opp'n Mem., Docket

---

[3] Although the parties included "cap body" as a disputed term for the court to construe in their joint claim construction (Joint Claim Const., Docket No. 41 at 8), Ivera later added the limitation, "cap body having a cross sectional thickness," as used in claim 7 of the '308 patent, to its proposed construction of the term.

13

No. 51 at 19.)  Ivera relies on testimony of the two experts in the case, Dr. William Durgin and Karl Leinsing to support its construction.  Both Catheter Connections and Ivera acknowledged that the patent specification reveals almost nothing about the term.

But because the term "cap body" is found in claim 1 of the '308 patent without the limitation "having a cross sectional thickness," and because, at this stage, the court concludes that it is not necessary to construe the additional language, the court construes only the term "cap body" in claim 1 and will not construe claim 7 of the '308 patent.  The court agrees with Catheter Connections that "cap body" as used in claim 1 of the '308 patent, means just that: the body of the cap.  If, at a later time, the parties believe that further construction is needed for the term, either in claim 1 or claim 7, they may ask the court at that time.

B.    Infringement

After claim construction, the second step in the infringement analysis is to compare the construed claim to the accused product to determine whether there is a likelihood of infringement.  See Seachange Int'l v. C-COR, Inc., 413 F.3d 1361, 1377 (Fed. Cir. 2005).  Catheter Connections contends that Ivera's Curos Tips product literally infringes claims 1 and 18 of the '681 patent and claims 1 and 7 of the '308 patent.  And, as noted, the court will not include claim 7 of the '308 patent in its infringement analysis.

Infringement of Claim 1 and Claim 18 of the '618 Patent

The Curos Tips product meets the "engage against" limitation of claim 1 and claim 18.  Ivera argues that it did not meet this limitation because, in its product, "[w]hen the tip makes contact with the top of the plunger, it presses it down and in normal use contact will be maintained, but there is no force to create an engagement between the top surface of the plunger

14

and the opening of the lumen." (Def.'s Opp'n Mem., Docket No. 51 at 17.) But the court's

construction does not require interlocking or intermeshing of components. Contact, which Ivera

admits is maintained in its product, is sufficient to meet the "engage against" limitation.

Ivera's description of how its product works shows that it also meets the "diminish flow"

limitation of claims 1 and 18.

> The post contacts the top surface of the plunger and pushes it deeper into the cap,
> forcing IPA (the disinfectant) around the plunger and past the flange so that it
> contacts the outer surfaces of the post of the male connector. Excess IPA flows
> on past the post and out of the cap via venting channels cut into the inner walls of
> the cap body.

(Id. at xxxi.) Later in its memorandum, Ivera states, "The Tips product is designed to prevent the

flow of alcohol into the lumen of the male connector." (Id. at 18.) The court's construction of

the phrase "diminish flow" encompasses a reduction in flow of some or all of the IPA.

The court concludes that Ivera's Curos Tips product infringes claim 1 and claim 18 of the

'681 patent.

<u>Infringement of Claim 1 of the '308 Patent</u>

Ivera contends that the gripping feature on its product does not include any recesses

because "a person of ordinary skill in the art at the time of the invention would recognize a well-

understood distinction between a 'recess' which is made by removing material from the body of

an object and a 'rib' which is made by adding material to the body of an object." (Id.) The

Curos Tips' gripping feature is formed by "ribs extending out from the cap body rather than

recesses carved out from the cap body . . . ." (Id. at 19.)

But the court's construction of "recess" includes a cleft or hollow made from either

adding or removing material. The Curos Tips meet the "recess" limitation.

15

Because the court is not construing claim 7 of the '308 patent, there appear to be no disputes over the term "cap body" in claim 1 of the '308 patent.

The court concludes that the Curos Tips infringes claim 1 of the '308 patent.

C.    Validity

Ivera lists a number of prior art references that it contends show that claims 1 and 18 of the '681 patent and claim 1 of the '308 patent are invalid because they are obvious. But the court concludes that Ivera has not met its burden of raising a substantial question that the claims are obvious.

Ivera's expert, Karl R. Leinsing, asserts that:

> Based on my own knowledge of the prior art and on my review of several prior art publications and devices, it is my opinion that asserted claim 1 of the '308 patent is invalid. Claim 1 of the '308 patent describes exactly the prior art protective caps discussed above with the sole addition of "an antiseptic agent disposed in the chamber."

(Leinsing Decl. ¶ 19, Docket No. 47.) Mr. Leinsing then lists a number of prior art caps, without identifying the specific prior art, which, in his view, contain the terms of claim 1. (Id. ¶ 20.) Mr. Leinsing identifies one prior art reference, the Baxter MiniCap, which he contends demonstrates the monotonically varying depth of the gripping feature. (Id. ¶ 21.)

Mr. Leinsing opines that claims 1 and 18 of the '681 patent are obvious. In support of this conclusion, he cites only three prior art references, the Peluso reference, the DeCaprio reference, and the Aalto reference, as examples of prior art that contained the claimed elements of claims 1 and 18. (Id. ¶¶ 23-26.)

Mr. Leinsing gives only a few specifics about what would have motivated an ordinary person skilled in the art to combine the various elements and instead relies on conclusory

assertions.

> Often, it will be necessary for a court "to look to interrelated teachings of multiple
> patents; the effects of demands known to the design community or present in the
> marketplace; and the background knowledge possessed by a person having
> ordinary skill in the art, all in order to determine whether there was an apparent
> reason to combine the known elements in the fashion claimed by the patent at
> issue.

KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007). But to facilitate review, "this analysis

should be made explicit." Id. (emphasis added); see also In re Kahn, 441 F.3d 977, 988 (Fed.

Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory

statements; instead, there must be some articulated reasoning with some rational underpinning to

support the legal conclusion of obviousness."). Besides pointing to figures, Mr. Leinsing does

not explain what features of which prior art references would be combined to create the male cap,

nor why it would be so obvious for someone skilled in the art to do so. This is not sufficient to

show a likelihood of establishing that Catheter Connections' male cap is invalid for obviousness.

    2.    <u>Irreparable Harm</u>

    The second factor a party seeking a preliminary injunction must establish is that it will

suffer irreparable harm if the preliminary injunction is not granted. Hybritech Inc. v. Abbott

Labs., 849 F.2d 1446, 1456 (Fed. Cir. 1988). This "entails showing a likelihood of substantial

and immediate irreparable injury." Apple Inc. v. Samsung Elecs. Co., Ltd., 695 F.3d 1370, 1374

(Fed. Cir. 2012) (quoting Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1325 (Fed.

Cir. 2012)). The essence of showing irreparable harm is demonstrating an injury that money

damages cannot sufficiently remedy. See e.g., High Tech Med. Instrumentation, Inc. v. New

Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995). Even if some harm could be remedied

by money damages, this does not negate a finding of irreparable harm. See Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012). The patent statute allows injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable by money. See 35 U.S.C. § 283; see also Hybritech, 849 F.2d at 1457.

Catheter Connections maintains that it will suffer irreparable harm similar to that in Robert Bosch LLC v. Pylon Manufacturing Corporation, 659 F.3d 1142 (Fed. Cir. 2011). In Robert Bosch, the Federal Circuit determined that the following was overwhelming evidence of irreparable harm: "(1) the parties' direct competition; (2) loss in market share and access to potential customers resulting from [the defendant's] introduction of infringing [products]; and (3) [the defendant's] lack of financial wherewithal to satisfy a judgment." Id. at 1151.

Specifically, Catheter Connections contends that it will suffer irreparable harm for several reasons if an injunction is not granted. First, the introduction of Ivera's Curos Tips onto the market has made it more difficult for Catheter Connections to sell its patented male cap to GPOs under the "new technology" exception. Catheter Connections had the only male cap on the market between March 2011 and December 2012. But because Ivera started selling male caps and amending its existing GPO contract relationships to include the Curos Tips, Catheter Connections now faces the possibility of being completely driven out of the market or will have to bid its male and LAV caps below cost in order to compete for the GPO contracts. According to Catheter Connections, if Ivera is stopped from selling its Curos Tips, "hospitals that want to fully protect their patients' IV lines will buy from Catheter Connections." (Jordan Decl. ¶ 13, Docket No. 68.)

18

Second, Catheter Connections argues that "any sale of male caps by Ivera is a sale lost by Catheter Connections." (Jordan Decl. ¶ 65, Docket No. 31.) Similar to Catheter Connections' contention that its market share would increase as a result of injunctive relief, it contends that a preliminary injunction would also likely increase sales of Catheter Connections' male caps because most hospitals currently buying from Ivera would buy from Catheter Connections instead.

Third, because Ivera has priced its Curos Tips at prices below the price at which Catheter Connections can make a profit, the continued sale of the Curos Tips will create irreversible price erosion.

Fourth, allowing Ivera to continue to sell its male cap will undermine Catheter Connections' reputation as an innovator and producer of quality products because Ivera's product is flawed and lower in quality than Catheter Connections' male cap.

And lastly, without an injunction, Catheter Connections argues that it will lose business value because it will lose future investment capital, stock value, and the ability to attract additional investors.

Ivera strongly disputes Catheter Connections' arguments. Ivera primarily argues that Catheter Connections cannot satisfy the irreparable harm element because Catheter Connections has unreasonably delayed in filing a motion for injunctive relief and that any harm suffered by Catheter Connections is from its own delay and "in coming to the market late with a poorly conceived product, a lack of understanding regarding needs of its customers, and a failed strategy for accessing GPO customers." (Def.'s Opp'n Mem., Docket No. 51 at vii.) Ivera also argues that an injunction will not help Catheter Connections because, according to Ivera, it will "not

19

even make a dent in [Catheter Connections' financial position]. (Id.) According to Ivera, Catheter Connections cannot be certain that an injunction will lead to increased GPO contracts and sales, but even if it did, "even crediting [Catheter Connections] with all of Ivera's annual sales for the prior year would not materially affect [Catheter Connections'] financial condition." (Id. at 7.) And finally, Ivera argues that an injunction is not warranted because "[e]very aspect of damages identified by [Catheter Connections] [i.e. lost sales, loss of market share, loss of market opportunities, price erosion, loss of business value, and injury to reputation] can be remedied by money damages." (Id. at 10.)

Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm. Celsis, 664 F.3d at 930 (citing Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008)); Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013) (irreparable injury may include "different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction"); Sanofi–Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1382–83 (Fed. Cir. 2006). And "[i]t is well-established that a movant's loss of current or future market share may constitute irreparable harm," Grand River Enter. Six Nations Ltd. v. Pryor, 481 F.3d 60, 67 (2d Cir. 2007), even if it only moderately affects a patentee company's profitability or small part of its business. See Robert Bosch, 659 F.3d at 1152 (internal quotations omitted); Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 975–76 (Fed. Cir. 1996) (loss of market opportunities cannot be quantified or adequately compensated with money and is evidence of irreparable harm); In re BRCA1-, BRCA2-Based Hereditary Cancer Test Patent Litig., No. 2:13-CV-640-RJS, 2014 WL 931057, at *36 (D. Utah March 10, 2014) ("the court must heed the clear instruction from the

Federal Circuit to act with caution in assuming that money damages will suffice when Plaintiffs have shown harms likely flowing from price erosion, loss of market share, and loss of patent terms.").

Regarding loss of sales, the Federal Circuit has held that "lost sales to a direct competitor" evinces irreparable harm. Systemation, Inc. v. Engel Indus., Inc., No. 98–1489, 1999 WL 129640, at *6 (Fed. Cir. Mar. 10, 1999) (unpublished opinion). "The existence of a two-player market may well serve as a substantial ground for granting an injunction–e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee . . . ." Robert Bosch, 659 F.3d at 1151. Exclusivity "is closely related to the fundamental nature of patents as property rights [and] is an intangible asset that is part of a company's reputation." Douglas Dynamics, 717 F.3d at 1345. When only two companies are in competition with each other, "the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." Id.

In the male cap market, Catheter Connections was the only company selling male caps until Ivera started producing and selling the Curos Tips product in late 2012. Catheter Connections has offered evidence that the market share of its dark blue male cap has greatly declined since the Curos Tips was introduced. (Hampton Decl. ¶ 20-21, Docket No. 33.) Scott Hampton, a financial consultant and forensic accountant, testified that between quarter one and quarter three of 2013, Catheter Connections' market share for male caps decreased from ███ to ███ even while its revenue increased across all three quarters. (Id.) And as shown in Mr. Hampton's chart, Ivera's revenue from male cap sales between quarter two and three increased from ███ to ███, while Catheter Connections' revenue only increased from ███

21

CONFIDENTIAL INFORMATION REDACTED

to ▮▮▮▮▮ for the same period. (Id. ¶ 21.)  Ivera has not offered any competing evidence in response to Catheter Connections' evidence of its decreasing market share.

While there are several competitors in the LAV cap market, only Catheter Connections and Ivera currently produce disinfecting caps for the male end of the IV line.  (See Jordan Decl. ¶¶ 59, 65, Docket No. 31.)  In this two player market, Catheter Connections and Ivera directly compete for sales and contracts with hospitals and the GPOs.  Because the GPO contracts appear to arise out of LAV cap demand, it is hard to quantify how many sales or clients Catheter Connections would have if Ivera were no longer producing male caps.  But because Catheter Connections and Ivera are the only two competitors in the market, a sale by one company can automatically be considered a lost sale for the other.  In this case, all of Ivera's male cap sales are lost sales for Catheter Connections.  By allowing Ivera to continue selling the Curos Tips, Catheter Connections will continue to lose sales.

Catheter Connections also contends that it will suffer irreparable price erosion because it will be forced to drastically change its pricing structure in order to compete with Ivera's lower-priced and lower-quality product. (Jordan Decl. ¶¶ 81-82, Docket No. 31; Borch Decl. ¶¶ 38-45, Docket No. 32.)  In addition to loss of sales and loss of market share, a patentee competing against an infringer may also be faced with the need to lower its price to compete against its own innovative design. Won-Door Corp. v. Cornell Iron Works, Inc., No. 2:13-CV-331-TS, 2013 WL 5503188, at *4 (D. Utah Oct. 3, 2013).  "The loss of pricing power resulting from the sale of inexpensive [infringing products] is, by its very nature, irreparable." Mint, Inc. v. Amad, No. 10 Civ. 9395(SAS), 2011 WL 1792570, at *3 (citing Abbott Labs., 544 F.3d at 1362);  Purdue

22

CONFIDENTIAL INFORMATION REDACTED

Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood

of price erosion and loss of market share are evidence of irreparable harm).

Catheter Connections has demonstrated that because Ivera's male cap is priced lower,

Catheter Connections was forced to lower its prices in order to avoid losing business.  (Borch

Decl. ¶ 39, Docket No. 32.)  When Catheter Connections was the sole male cap market

participant, it was able to charge ███ for its DualCap and ███ for its dark blue male cap on

the IV pole strip.  (See id. ¶ 19.)  Ivera stated that its current production cost has been

approximately ███ per unit but that it anticipates that automation will reduce its cost to

approximately ███ per unit.  (Rogers Decl. ¶ 32, Docket No. 54.)  Even without automation,

Ivera has reduced the price of its male cap from around ███ per unit to ███.  (Jordan Decl.

¶ 80, Docket No. 31.)  While Catheter Connections' budget projects that it will offer its dark blue

male cap for sale in 2014 at an average unit price of ███, this price is significantly below its

own per unit production cost.

Although Ivera alleges that "significant downward pricing pressure in the disinfecting cap

market [is] caused by competition for LAV caps" and that this pressure "impacts the market for

the male connector Tips," (see id.), the evidence shows that the infringing Curos Tips product's

presence on the market is a significant contributor to Catheter Connections' loss of pricing

power.  While price erosion has already occurred, without an injunction more price erosion will

occur as Ivera lowers the price on its male cap once automation happens.  Accordingly, Catheter

23

CONFIDENTIAL INFORMATION REDACTED

Connections has demonstrated irreparable harm flowing from the continued price erosion it will suffer if Ivera is not enjoined.[9]

### A.    Delay

Ivera argues Catheter Connections has created and aggravated any harm by its own unreasonable delay.  According to Ivera, Catheter Connections cannot show irreparable harm because Catheter Connections delayed twenty-one months before seeking a preliminary injunction against Ivera.  (See Def.'s Opp'n Mem., Docket No. 51 at vi.)  And Ivera states that Catheter Connections has known about Ivera's Curos Tips product since 2012 and any harm experienced by Catheter Connections because of Ivera's presence in the male cap market could have been prevented by filing for a preliminary injunction when the original June 2012 lawsuit was filed or anytime thereafter.

The period of delay exercised by a party before seeking a preliminary injunction is "but one factor to be considered by a district court in its analysis of irreparable harm." Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988) "Absent a good explanation . . . a substantial period of delay . . . militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995); see also Nutrition 21 v. United States, 930 F.2d 867, 872 (Fed. Cir. 1991) (finding that "Nutrition 21

---

[9]Catheter Connections also claims that its reputation will be irreparably damaged absent injunctive relief.  See Douglas Dynamics, 717 F.3d at 1344-45 (harm to reputation can be irreparable harm).  But the court need not decide whether Catheter Connections' reputation would be harmed absent a preliminary injunction because the court has found irreparable harm in loss of sales, loss of market share, and price erosion.

24

delayed for a substantial period of time before seeking a preliminary injunction at least suggests

that the status quo does not irreparably damage Nutrition 21") (emphasis in original).

Catheter Connections has now filed four[10] lawsuits against Ivera claiming that Ivera's

male cap products infringe various patents owned by Catheter Connections.  The present motion

is Catheter Connections' first motion for preliminary injunctive relief.  Catheter Connections

gives four reasons for not seeking an injunction in the earlier lawsuits:

1.  Two of the three other male cap lawsuits were filed when Ivera did not have FDA clearance or any infringing products on the market (it was showing and demonstrating the accused prototypes at trade shows and on sales calls);

2.  The parties were engaged in settlement discussions during part of the pendency of the related male cap litigation, which ultimately led to Ivera's agreement not to make, use, sell, or offer for sale the accused X10 male cap prototype;

3.  The Asserted Patents are different patents with broader claim scope and fewer limitations than the patents in the related male cap cases, thus more amenable to consideration in an expedited injunction proceeding; and

4.  Catheter Connections was not in a financial position to seek an injunction in the other male cap cases.

(Pl.'s Reply Mem., Docket No. 64 at 8-9.)  The court is not persuaded by Catheter Connections'

first, second, and fourth justifications.  But Catheter Connections' third explanation that

"additional limitations in the earlier patent claims require[d] more complex and costly claim

construction and proof" is more compelling.  (See id. at 9 n.43.)

At the March 27 and 28, 2014 hearing, Catheter Connections presented and referred to a

---

[10]Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-531-DN (filed June 5, 2012); Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-748-DN (filed July 31, 2012); Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-1127-DB (filed December 11, 2012); and the present suit, Catheter Connections, Inc. v. Ivera Medical, Case No. 2:12-CV-14-TC (filed February 4, 2014).

table comparing five[11] of its male cap patents.  (See Catheter Connections' Male Cap Patents table, March 27, 2014 Catheter Connections Presentation Binder.)  In the table, Catheter Connections showed how the '681 and '308 patents are broader than the other three patents. Because these patents were broader and "more amenable to consideration in an expedited injunction proceeding," Catheter Connections could not have reasonably brought a motion for injunctive relief any sooner than it did and it was reasonable for it to not file for a preliminary injunction in the other actions.  See, e.g., Apple, Inc. v. Samsung Elecs. Co., Ltd., 877 F. Supp. 2d 838 (N.D. Cal. 2012) (reversed on other grounds) (where court found that the patentee's delay in seeking to enforce patents was not unreasonable, as would have undercut patentee's likelihood of suffering irreparable harm and patentee's failure to enforce one patent against earlier generations of accused products did not weigh heavily against finding of irreparable harm); see also Rosen Entm't Sys., LP v. Icon Enters., Inc., 359 F. Supp. 2d 902, 910-11 (C.D. Cal. 2005) (court found that the patentee's seventeen-month delay in suing was excused and did not preclude a finding of irreparable injury needed to warrant preliminary injunction, because the patentee had been busy during that time suing other infringers).

Accordingly, the court finds that Catheter Connections has shown that it will suffer irreparable harm without preliminary injunctive relief.

3.    Balance of Hardships

The third factor for whether a preliminary injunction should be granted requires the court to examine the balance of the hardships between the two parties.  Hybritech Inc. v. Abbott Labs.,

---

[11]U.S. Patent 8,172,825, U.S. Patent 8,231,587, U.S. Patent 8,328,767, and the patents at issue in this case, the '681 patent and the '308 patent.

26

849 F.2d 1446, 1457 (Fed. Cir. 1988). "A court weighs the hardship to the patentee if no injunction is entered against the harm to the alleged infringer if the injunction is granted incorrectly." Abbott Labs. v. Sandoz, Inc., 500 F. Supp. 2d 807, 844 (N.D. Ill. 2007) (citing Hybritech, 849 F.2d at 1457).

   Catheter Connections argues that the balance of hardships weighs in favor of granting the preliminary injunction because of the irreparable harm it will suffer if denied injunctive relief, ███████████████████████████████ Ivera alleges that the balance of equities falls in its favor because "Ivera's continued presence in the market, educating potential customers" will benefit Catheter Connections and because Ivera has established relationships with customers and GPOs, devoted "substantial resources for educating customers and marketing its products," and "invested heavily in developing its manufacturing capacity for the accused products." (Def.'s Opp'n Mem., Docket No. 51 at 23.) Ivera also argues that it will be harmed more now than had Catheter Connections sought injunctive relief before Ivera had entered the male cap market and started selling its Curos Tips product.

   Certainly, a preliminary injunction will place certain hardships on Ivera, but on balance, equity favors Catheter Connections, a company that has invested time and resources into its patented technology. The court disagrees with Ivera's contention that Catheter Connections will benefit more from Ivera's continued presence in the market than it would with the issuance of an injunction. Without an injunction, Catheter Connections will still be competing with another version of its own patented product. "It should go without saying that one who infringes upon a patent cannot be heard to complain about the financial consequences of either ending its infringing conduct or being restored to its pre-infringement position." Abbott Labs., 500 F.

27

CONFIDENTIAL INFORMATION REDACTED

Supp. 2d at 845.  And while Ivera would be prevented from selling and marketing its product, it

has presented no evidence to show how this harm outweighs the damage that would be done to

Catheter Connections if no injunctive relief is provided.

Accordingly, the balance of harms weighs in favor of Catheter Connections.

4.    Public Interest

The public has a strong interest in upholding patent rights.  See Glaxo Group Ltd. v.

Apotex, Inc., 64 F. App'x 751, 756 (Fed. Cir. 2003).  The patent process encourages investment

in research and development, but without protection of those rights, the incentives are

diminished.  See Sanofi–Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("We

have long acknowledged the importance of the patent system in encouraging innovation.").  The

Federal Circuit has traditionally found that "the public interest prong favors the party that will

likely prevail on the patent infringement claim."  Abbott Labs v. Andrx Pharms., Inc., 452 F.3d

1331, 1348 (Fed. Cir. 2006) ("Although the public interest inquiry is not necessarily or always

bound to the likelihood of success on the merits . . . we agree . . . that the public interest is best

served by enforcing patents that are likely valid and infringed.").

The court has held above that Catheter Connections is likely to succeed on the merits of

its infringement claim.  Catheter Connections has invested time and resources in developing and

patenting technology that disinfects the male luer of an IV catheter.  Even if Ivera is enjoined

from selling its male cap, the public will still benefit from Catheter Connections' dark blue male

cap.  See Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 932 (Fed. Cir. 2012) (noting that

products for drug research and development would still be available even with an injunction

because the parties sold essentially the same products).  And although competition in the

28

marketplace should also be protected, the court finds that Ivera is competitive because of the fact that it has taken advantage of Catheter Connections' patented technology for male caps. For these reasons, the court finds that the public interest favors the enforcement of Catheter Connections' patent rights.

<div align="center">ORDER</div>

The court concludes that Catheter Connections has provided clear and convincing evidence of its reasonable likelihood of success on the merits, irreparable harm, that the balance of hardships weighs in its favor, and that the public interest favors the grant of this injunction, and that these four factors weigh heavily and compellingly in its favor, the court GRANTS Catheter Connections' motion.

Neither party acknowledged the question of an appropriate bond amount. Under Rule 65 of the Federal Rules of Civil Procedure, "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While the court has wide discretion under Rule 65(c) to determine whether security is required, see Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003) (citing Cont'l Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 782 (10th Cir. 1964) (per curiam)), the court must at least give consideration to whether the circumstances of the case justify imposing a bond or "leaving the enjoined party bereft of security." Coquina Oil Corp. V. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987).

<div align="center">29</div>

Accordingly, the court orders each party to file simultaneous briefs by Friday, April 18, 2014, on the issue of whether a preliminary injunction bond should be required.  Catheter Connections must also submit a proposed order.


SO ORDERED this 14th day of April, 2014.


BY THE COURT:

TENA CAMPBELL
United States District Judge

30

United States District Court
for the
District of Utah
April 14, 2014

******MAILING CERTIFICATE OF THE CLERK******

RE:    Catheter Connections v. Ivera Medial
       2:14-cv-00070-TC


H. Dickson Burton
TRASKBRITT PC
230 S 500 E #300
PO BOX 2550
SALT LAKE CITY, UT 84110

Kerry L. Timbers
SUNSTEIN KANN MURPHY & TIMBERS LLP
125 SUMMER ST
BOSTON, MA 02110-1618

Jonathan Hangartner
X-PATENTS APC
5670 LA JOLLA BLVD
LA JOLLA, CA 92037

Nathan D. Thomas
JONES WALDO HOLBROOK & MCDONOUGH (SLC)
170 S MAIN ST STE 1500
SALT LAKE CITY, UT 84101




/s/Jeff Taylor

_____

Jeff Taylor, Deputy Court Clerk

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CATHETER CONNECTIONS, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br><br>              vs.<br><br><br>IVERA MEDICAL CORPORATION, a California corporation,<br><br>                    Defendant. | **ORDER**<br><br><br><br><br>Case No. 2:14-CV-70 |

Having fully considered Plaintiff Catheter Connections, Inc.'s (Catheter Connections) Motion for Preliminary Injunction, including the memoranda, the various declarations and exhibits submitted by the parties, and the oral argument and testimony presented at the hearing on March 27 and 28, 2014, and having entered its Order and Memorandum Decision on April 14, 2014, concluding that Catheter Connections has shown that the four preliminary injunction factors weigh heavily and compellingly in its favor, the court further finds and orders as follows:

1.   Catheter Connections has met its burden of establishing likelihood of success on the merits of its claims that Defendant Ivera Medical Corporation (Ivera) has infringed claims 1 and 18 of U.S. Patent 8,641,681 and claim 1 of U.S. Patent 8,647,308, by making, using, selling and offering for sale its accused Curos Tips™, male disinfectant caps.  Further, Ivera has not shown a likelihood of establishing that claims 1 and 18 of U.S. Patent 8,641,681 and claim 1 of U.S.

Patent 8,647,308 are invalid and has not met its burden of raising a substantial

question that the claims are obvious.

2.    Catheter Connections is likely to be irreparably harmed if Ivera is allowed to

continue making, using, selling, offering for sale, and/or importing the accused

Curos Tips™ male disinfectant caps because such conduct will result in Catheter

Connections' loss of sales, loss of market share, and price erosion.  Catheter

Connections also could not have reasonably brought a motion for injunctive relief

any sooner than it did, and it was reasonable for it to not file for a preliminary

injunction in other, previously-filed patent infringement actions against Ivera.

3.    The balance of hardships favors Catheter Connections, a company that has

invested time and resources into its patented technology and without an

injunction, Catheter Connections will still be competing with another version of

its own patented product.  Ivera has presented no evidence that harm from being

prevented from selling and marketing its product outweighs the damage that

would be done to Catheter Connections if no injunctive relief is provided; and

4.    The public interest will be served by enforcing Catheter Connections' patent rights

and granting Catheter Connections' Motion for Preliminary Injunction.

In view of the foregoing, Catheter Connections' Motion is GRANTED and a Preliminary

Injunction is ordered and entered as follows:

Ivera, and its officers, agents, servants, employees, attorneys, and other persons who are

in active concert or participation with Ivera, who receive actual notice of this Order by personal

service or otherwise, are immediately enjoined during the pendency of this litigation from

making, using, selling, offering for sale, or importing into the United States Ivera's accused Curos

Tips™ or any device no more than colorably different from Ivera's accused Curos Tips™,

pending entry of a final judgment in this action.

      This injunction shall become effective upon receipt of notice by the parties to the above-

captioned action, through the court's electronic filing system or other actual notice, of the posting

by Plaintiff of a bond in the amount of $250,000.


      SO ORDERED this 23rd day of April, 2014.


      BY THE COURT:

      _____

      TENA CAMPBELL
      United States District Judge

A000036

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CATHETER CONNECTIONS, INC., a Delaware corporation, <br><br>            Plaintiff, <br><br><br>      vs. <br><br><br> IVERA MEDICAL CORPORATION, a California corporation, <br><br>           Defendant. | **ORDER** <br><br><br><br><br><br> Case No. 2:14-CV-70 |

On April 14, 2014, the court granted Catheter Connections' motion for preliminary injunction and ordered the parties to submit additional briefing on the issue of an appropriate bond amount.

In issuing a preliminary injunction, the court may require a bond for the payment of costs and damages that may be suffered by a party wrongfully enjoined.  See Fed. R. Civ. P. 65(c). The court has carefully considered the materials provided by the parties in connection to the court's request for briefing on a bond's issuance.  While the court recognizes that Ivera has set forth the significant losses it will suffer in the event that the preliminary injunction was issued in error, the court is more convinced that Catheter Connections cannot possibly provide a bond in an amount greater than $250,000 without destroying their business.  Although the primary purpose of the bond is to protect Ivera, the court will not drive Catheter Connections into bankruptcy in order to do so.

If the possibility arises where the court was wrong in granting the preliminary injunction, Ivera will have the opportunity to recover a judgment from Catheter Connections' ongoing business.

Based on the court's discretionary authority under Rule 65(c) and after considering whether the circumstances justify the imposition of a bond, Catheter Connections is hereby ORDERED to post a cash bond with the court in the amount of $250,000 no later than Friday, May 9, 2014.

SO ORDERED this 23rd day of April, 2014.

BY THE COURT:

TENA CAMPBELL
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2014, I filed the foregoing CORRECTED

BRIEF OF APPELLANT – NON- CONFIDENTIAL with the Clerk of the Court

through the Court's CM/ECF system and served the same via email upon the

following:

> H. Dickson Burton
> Andrew A. Hufford
> TRASK BRITT, PC
> P.O. Box 2550
> 230 South 500 East, Suite 300
> Salt Lake City, Utah 84110
>  (801) 532-1922
> hdburton@traskbritt.com
> aahufford@traskbritt.com
>
> Vicki E. Farrar
> CATHETER CONNECTIONS
> 2455 East Parley's Way, Suite 150
> Salt Lake City, UT 84109
> (801) 906-0820
> vfarrar@cathconn.com

/s/ Jonathan Hangartner

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 14-1443

CATHETER CONNECTIONS, INC. V. IVERA MEDICAL CORPORATION

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements and Type Style Requirements**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,587  words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14 point Times New Roman.

Dated: June 30, 2014

/s/Jonathan Hangartner
Jonathan Hangartner
X-Patents, APC
5670 La Jolla Blvd.
La Jolla, California  92037
Telephone:  (858) 454-4313
jon@x-patents.com

*Attorney for Defendant-Appellant*
*Ivera Medical Corporation*